**MAINE HUMAN RIGHTS COMMISSION
et al.**

v.

**CITY OF AUBURN et al.**

Supreme Judicial Court of Maine.

Dec. 7, 1979.

William J. Kelleher (orally), Asst. Atty. Gen., Augusta, for Maine Human Rights Commission.

Harold Lichten (orally), Pine Tree Legal Assistance, Lewiston, for Connie Hall.

Isaacson, Isaacson & Hark by Robert S. Hark (orally), Lewiston, for Marymay Bernard.

Linnell, Choate & Webber by G. Curtis Webber (orally), Auburn, for defendants.

Before McKUSICK, C. J., and POMEROY, WERNICK, GODFREY and NICHOLS, JJ.

McKUSICK, Chief Justice.

Plaintiffs Maine Human Rights Commission and two individuals, Connie Hall and Marymay Bernard, appeal from the judgment of the Superior Court (Androscoggin County) dissolving a temporary restraining order and denying injunctive relief and damages. Plaintiffs brought this action in November, 1978, alleging that defendants City of Auburn, the Auburn Civil Service Commission (CSC) and its three commissioners, and the Auburn Police Department discriminated against female applicants for police officer positions because of their sex, in violation of section 4572(1)(A) of the Human Rights Act.[1] On appeal, plaintiffs

---

1. 5 M.R.S.A. § 4572(1)(A) (1979) reads:

§ 4572. Unlawful employment discrimination

1. Unlawful employment. It shall be unlawful employment discrimination, in violation of this Act, except where based on a bona fide occupational qualification:

A. For any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of race or color, sex, physical or mental handicap, religion, ancestry or national origin or age, or because of any such reason to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment, or in recruiting of individuals for employment or in hiring them, to utilize any employment agency which such employer knows, or has reasonable cause to know, discriminates against individuals because of their race or color, sex, physical or mental handicap, religion, age, ancestry or national origin; . . .

The original Maine Human Rights Act was enacted by P.L. 1971, ch. 501, to be effective July 1, 1972. The prohibition of discrimination because of sex was added to section 4572(1)(A) by P.L. 1973, ch. 347, § 6.

contend, *inter alia*, that the Superior Court committed error in its approach to the evaluation of the totality of the evidence in this action brought under the Human Rights Act. We agree. We therefore sustain the appeal and vacate the judgment entered for defendants.

## I.

In September, 1978, the Auburn police chief informed the Auburn Civil Service Commission (CSC) that his department had three patrol officer vacancies to fill. At that time there were no women among the 39 sworn officers in the police department. An advertisement for the jobs was placed in the local newspapers,[2] and on October 22, twenty-two applicants—three women and nineteen men—completed written and oral examinations administered by the CSC. The written examination consisted of 70 multiple-choice questions, each worth one point. Then the three CSC commissioners jointly interviewed the applicants, grading each by a score from 1 to 5 in each of ten categories.[3] Thus, the highest possible score on the interviews that a candidate could obtain in the aggregate was 150 points.

Each applicant's oral and written scores were added to produce his or her total score, up to a maximum possible grading of 220 points. The twenty-two applicants were then ranked by their total scores, and the top seven were certified as qualified for consideration by the police chief.[4] None of the female applicants was ranked in the top seven positions overall. Plaintiff Bernard had tied for second place on the written test but was ranked in the 21st position on the oral interview; her composite ranking was 17th. Plaintiff Hall ranked ninth on the written test but was ranked 21st with Bernard on the oral interview, and thus her overall ranking was 19th. The third female applicant, Joan Hill,[5] after ranking seventh on the written test, fell to 18th on the oral interview and 18th overall. Thus, while the women scored well on the written examination, their low evaluation by the interviewers knocked them out of contention for certification to the police chief.

Had the female applicants received the average male interview scores, at least plaintiff Bernard would have been among the top seven candidates overall; plaintiff Hall and Ms. Hill would have been placed just below the top seven.[6] In contrast to the grades given them on the interviews, the average female score on the written test was 53.7 out of a maximum point score of 70, while the average male score was only 45.7.

On November 3, 1978, plaintiffs Bernard and Hall filed sworn complaints against defendants with the Maine Human Rights Commission pursuant to 5 M.R.S.A. § 4611. After a preliminary investigation, the commission found that reasonable grounds ex-

2. A copy of the advertisement was attached as an exhibit to plaintiffs' complaint. The advertisement stated that the jobs available for "Career Police Officers" constituted "An interesting, challenging opportunity to measure up as a MAN in a variety of assignments." (Capitalization in the original)

 Counsel for defendants informed the court that the advertisement had been erroneously run by the newspaper, and plaintiffs did not offer it in evidence. It does not appear whether any curative advertisement was run prior to the CSC certification process at issue, or whether any other advertisement announced the 1978 openings in the Auburn police department.

3. The categories were: Appearance, Friendliness, Personality, Conversational Ability, Poise-Stability, Experience, Information About General Work Field, Drive, Alertness, and "Overall."

4. Once the police chief received the list of certified candidates, he caused physical examinations and agility tests to be administered before making his final selections, which were then subject to the approval of Auburn's city manager.

5. Ms. Hill was not a plaintiff in this action but did testify at trial. She was employed by the Auburn Police Department as a dispatcher and was a sergeant in the department's reserve unit.

6. There was no set number of candidates that the CSC had to certify. Instead, the CSC commissioners found a "natural break" in the scores and created a cut-off at that point.

isted to believe that unlawful discrimination had occurred. The commission directed its counsel to file this action in the Superior Court because, pursuant to 5 M.R.S.A. § 4612(4)(A), it found that immediate relief was required to prevent "irreparable injury or great inconvenience" to Hall and Bernard. But before the commission could file its complaint and motion for a temporary restraining order, the police chief hired two of the seven men certified by the CSC. The following day, November 14, the Superior Court granted a temporary restraining order prohibiting defendants from filling the remaining position and permitted Hall and Bernard to intervene as named plaintiffs. With the agreement of the parties, the court ordered the hearing on plaintiffs' motion for a preliminary injunction to be consolidated with the court hearing on the permanent relief requested by plaintiffs. *See* 5 M.R.S.A. § 4613(1).

At trial plaintiffs called as their first witness the CSC chairman, who testified that in the interview he asked each candidate how he or she would break up a fight between two big men on a public sidewalk. He also asked the three women how they would respond given the fact that they were "females, and perhaps not of the aggressive nature as some males can be." When the chairman posed his hypothetical question to plaintiff Hall, he told her that more than "just a pretty face" was needed to break up a fight. He gave Ms. Hall an oral interview score of 13 out of 50—the lowest score given any of the applicants by any of the interviewers. As to plaintiff Bernard, the CSC chairman told her that she should be content with the fact that she was the mother of three sons. He also testified that Bernard was not the "rough-

tough type" and that he, consequently, gave her a score of 18 out of 50. He added that neither Bernard nor Hall had prior police experience, a factor of much importance to him.

The CSC chairman summarized his reasons for giving all the women low scores by stating that women could not possibly handle the physical situations that make up "a lot" of police work. He concluded his testimony by declaring that the city of Auburn and its police department could not "afford [the] luxury" of having female police officers. Additionally, the CSC chairman conceded that he was not familiar with the city of Auburn's affirmative action plan adopted more than a year earlier and did not know what "affirmative action" meant.

Over the five-year period starting in 1974, the CSC had certified only one female police candidate—Jean Greeley. However, even though the CSC listed her first among the certified applicants,[7] it flagged her candidacy with the comment that she "does not meet [the] physical requirements of male applicants."[8] At trial Ms. Greeley testified that she was never offered the police officer position and that the police chief told her that he could not put a female out onto the street. Similarly, when plaintiff Hall had first applied for an Auburn police officer job in 1977, she was told by the officer second in command that the Auburn police department was not yet ready for females.

The police chief testified that both of the two applicants he hired in November, 1978, had had prior police experience, a factor that he considered very important. He conceded that few female applicants could be expected to have prior police experience since few women occupied police officer positions in Maine. One of the CSC com-

7. Greeley's ranking was based on an examination procedure which differed significantly from the one challenged in this case. When Greeley was tested in 1974, the written test was worth 120 points, not 70 points. Consequently, her written score of 110 was weighted more in her composite score than the 1978 written scores of Hall and Bernard.

8. Through 1975 the city of Auburn had height, weight, and age requirements for police offi-

cers; the applicant had to be at least 5 feet 8 inches tall and weigh 140 pounds. That height requirement would have excluded 97.5% of all women over the age of 18. *See* Note, "Height Standards in Police Employment and the Question of Sex Discrimination," 47 *S.Cal.L.Rev.* 585, 588 n. 13 (1974). Although the Auburn requirements were eliminated by 1976, in October 1978 the CSC chairman still referred to them during his interview of Joan Hill.

missioners in addition to the chairman testified that he heavily relied upon the factor of prior police experience in his evaluation of the applicants. He confirmed that, of the three male applicants with prior police experience, all were certified by the CSC in 1978.

Defendants introduced statistical evidence regarding the percentage of male and female applicants who were certified by the CSC to the police chief. In the previous four years (1975–78), 18% of the male applicants had been certified, as opposed to none of female applicants. Going back through 1974, the year Jean Greeley was certified, only one out of thirteen[9] female applicants (7.7%) had been certified, as opposed to 20% of the male applicants. It was also established that of the thirteen female applicants, eight were rejected for not meeting the city's height, weight, or age requirement, four were not certified by the CSC, and one—Jean Greeley—received only a qualified certification.

The Superior Court's entry of judgment for defendants was based directly upon its construction of the burden-of-proof rule set forth in 5 M.R.S.A. § 4631:

> In any civil action under this Act, the burden shall be on the person seeking relief to prove, by a fair preponderance of the evidence, that the alleged unlawful discrimination occurred.

Stating that "[t]here is nothing in the statute which suggests a shifting of the burden of persuasion," the court held that plaintiffs had failed to meet their burden of proof in a number of respects.

In commenting upon plaintiffs' statistical proof regarding the disparity between male and female police applicants ultimately certified by the CSC, the court said:

> The most significant statistic, however, was so small as to be of no statistical significance whatsoever. In the past five years there have been only five female applicants for the Auburn Police Depart-

ment and of those five, one was certified by the Civil Service Commission following the administration of the written test and oral interview. No evidence was produced to establish that the Auburn Police Department or the City of Auburn discouraged women from applying for positions as members of the Auburn Police Department and one may only speculate as to the reasons why there were only five female applicants. If that number of female applicants is to be given any significance at all, it establishes that 20 percent of the females applying for positions on the Auburn Police Department were certified by the Civil Service Commission as qualified; whereas during the same period of time 18 percent of the male applicants for the Auburn Police Department were certified by the Civil Service Commission as qualified.

The Superior Court also held that plaintiffs had "failed to establish that the female applicants who took the last test and were not certified were qualified for the position." It further ruled that plaintiffs had failed to establish that they were as qualified as the male applicants certified by the CSC, and therefore:

> Absent such evidence there is no basis upon which this court can conclude that the female applicants were denied certification merely because they were female.

The "substantial weight" given to prior police experience by the CSC commissioners was also upheld by the Superior Court as being nondiscriminatory. That holding was based on the court's conclusion that "[p]rior experience is a bona fide job qualification, particularly in the field of law enforcement . . . ."

On appeal, plaintiffs challenge as erroneous the Superior Court's rulings that: (1) the burden of proof never shifted to defendants; (2) plaintiffs have the burden of establishing that they are at least as qualified as the male applicants who were certi-

9. The Superior Court found that "[i]n the past five years there have been only five female applicants for the Auburn Police Department," but was apparently referring only to those ap-

plicants who passed the city's preliminary height, weight, and age requirements and were examined by the CSC.

fied; (3) plaintiffs needed to show that they were denied certification "merely because they were female"; (4) plaintiffs adduced no evidence that officials of the city of Auburn had discouraged women from applying for police officer positions; and (5) prior police experience is a "bona fide job qualification" for the job of police officer. Plaintiffs also challenge as factually erroneous the trial court's finding that in the previous four years (1975–78) 20% of the female and 18% of the male applicants had been certified.

We conclude that the Superior Court did commit errors of law that require us to set aside its judgment for defendants.

## II.

■ In enacting the Human Rights Act, Maine was legislating against the background of prior federal antidiscrimination statutes[10] and a developing body of case law construing and applying those statutes. Over the years the federal cases have formulated a special methodology for evaluating the evidence introduced in cases of alleged unlawful employment discrimination. As we have previously held, the Maine legislature—by adopting provisions that generally track the federal antidiscrimination statutes—intended the courts to look to the federal case law to "provide significant guidance in the construction of our statute." *Maine Human Rights Comm'n v. Local 1361*, Me., 383 A.2d 369, 375 (1978). See also *Wells v. Franklin Broadcasting*

*Corp.*, Me., 403 A.2d 771, 773 n. 4 (1979). The special rules developed by the federal courts provide "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

We are here dealing with a *sui generis* body of law. These rules will not have applicability to cases not arising under an antidiscrimination statute.

■ The evaluation of the evidence is to be done by a judge, not a jury.[11] An action arising under the Human Rights Act is equitable in nature, and any relief thereunder is granted only through the exercise of the sound discretion of a judge.[12]

A. *The "Prima Facie Case" Rule and the Three-Step Evaluation of Evidence*

The principal respect in which the Superior Court went astray was to overlook, or choose to ignore, the special methodology that the United States Supreme Court has developed for evaluating the evidence in employment discrimination cases. The leading Supreme Court cases are *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ("disparate treatment"), *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (discriminatory "pattern or practice"), and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95

---

**10.** The federal provisions on employment discrimination are set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and in the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*

**11.** 5 M.R.S.A. § 4613(1), applying to actions brought by the Human Rights Commission, directs that:

Except as otherwise provided herein, the court shall hear the case and grant relief as in other civil actions for injunctions.

And section 4613(2)(B), applying to "any action filed under this Act by the commission or by any other person," speaks in terms of a court trial in detailing the relief that may be granted:

If *the court finds* that unlawful discrimination occurred, *its* judgment shall specify an *appropriate* remedy or remedies therefor.

(Emphasis added) In any civil action brought by an aggrieved person, "the plaintiff may, *in the court's sound discretion*, be entitled to any of the relief provided for in this Act." (Emphasis added) 5 M.R.S.A. § 4622. See *Lorillard v. Pons*, 434 U.S. 575, 583–85, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), and *Curtis v. Leother*, 415 U.S. 189, 196–97, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), which discuss without deciding whether a jury trial is available under Title VII.

**12.** Apparently both parties in *Wells v. Franklin Broadcasting Corp.*, Me., 403 A.2d 771 (1979), a case brought under the Maine Human Rights Act, acquiesced in trying the case to a jury, and no question in that regard was raised on appeal.

S.Ct. 2362, 45 L.Ed.2d 280 (1975) ("disparate impact"). The prima facie case standard declared in those cases was applied by this court in *Maine Human Rights Comm'n v. Local 1361, supra* at 378.

 The federal courts evaluate the whole evidence by a three-step method.[13] At the outset it may be of help for us to describe the three-step evaluation that is to be made of the evidence in a "disparate treatment" case, that is, one in which the plaintiff alleges that disparate treatment results from facially neutral hiring practices. The plaintiff at all times retains the ultimate burden of persuasion on the question whether unlawful discrimination has occurred. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011 (1st Cir. 1979). However, under the "prima facie case" rule, the judge may not decide against the plaintiff on the ground of failure to satisfy his ultimate burden of persuasion merely because of the absence of *direct* evidence of unlawful discrimination. If the judge finds proof of certain circumstances that the law treats as sufficient to support an inference of unlawful discrimination, then a prima facie case for the plaintiff is made out, and the plaintiff, in the judge's initial step of evaluating the evidence, has thus met his ultimate burden of persuasion.

 The judge, however, must move on to the second evaluation step. He must ascertain whether the record contains any evidence *having probative force* indicating at least on its face that the defendant had "some legitimate, nondiscriminatory reason" for the rejection of the plaintiff. *McDonnell Douglas Corp. v. Green, supra* 411 U.S. at 802, 93 S.Ct. 1817. If there is no such evidence, the "prima facie case" rule compels the judge to decide in favor of the plaintiff. If, however, there is such evidence, the judge must undertake a third evaluation step. The judge must penetrate behind the facial probative force of the

evidence to determine whether or not to *reject* the claimed nondiscriminatory reason as being the real reason for the defendant's conduct toward the plaintiff. We use the negative word "reject", rather than the affirmative "accept", to take account of the situation where the judge is unable to make up his mind whether or not to "accept" the claimed nondiscriminatory reason as the real one. We thereby make plain that no burden of persuasion shifts to the defendant at any stage of the evaluation of the evidence. *See Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 29, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (Stevens, J., dissenting).

 At this third evaluational step, if the judge is unwilling to reject the claimed reason as the real reason for the defendant's conduct toward the plaintiff, even if the judge may also be unwilling to accept it, the decision must be in favor of the defendant; the plaintiff will have failed to sustain his or her ultimate burden of persuasion. On the other hand, if the judge decides to reject the claimed reason as being the defendant's real reason, the decision will be for the plaintiff. The judge may be assisted in rejecting the defendant's claimed reason by the existence of affirmative evidence of pretext *or* by the strength of the inference of discrimination arising from the plaintiff's prima facie case. The judge may also be warranted in rejecting the defendant's claimed reason strictly on the basis of his assessment of the witnesses' credibility.

We now turn to a more detailed discussion of each of the three stages of evaluation of the whole evidence, as applied to the facts of the case at bar.

**B. The Plaintiff's Prima Facie Case**

At trial, plaintiffs sought to make a prima facie case of discrimination by three alternative theories: (1) disparate treat-

---

13. The federal courts usually express the three-step methodology as if a trial were in process. However, we should not lose sight of the fact that we are not talking about the order of evidence during trial or trial tactics. We are discussing how the judge, *after* the trial is over, analyzes *all* the evidence to determine whether unlawful discrimination has been proved by a preponderance of the evidence.

ment, as in *McDonnell Douglas, supra* ; (2) a past pattern or practice of discrimination (a type of disparate treatment), as in *Teamsters v. United States, supra* ; and (3) disparate impact, as in *Albemarle, supra.* The prima facie case on each theory of discrimination involves a somewhat different type of evidence that will support an inference of unlawful discrimination.

### 1. *McDonnell Douglas*

■ To make out a prima facie case of disparate treatment, the plaintiff must prove that she belongs to a protected class, that she applied and was qualified for the job sought, and that she was rejected. *McDonnell Douglas Corp. v. Green, supra* 411 U.S. at 802, 93 S.Ct. 1817. In this case, plaintiffs Hall and Bernard were members of the protected female class and they were rejected for the job sought. The contested issue concerned their qualifications.

■ The Superior Court erred in initially requiring plaintiffs to shoulder the burden of proving that they were at least as qualified as the male applicants who were certified by the CSC. In order for a prima facie case of discrimination to be made out, it need not include evidence of plaintiffs' *relative* qualifications. *See Davis v. Weidner,* 596 F.2d 726, 730 (7th Cir. 1979). All that is required to create an inference of discrimination is proof that plaintiffs were not rejected because of absence of a job opening or lack of the minimum objective qualifications prescribed for the job as a police officer. *See Davis v. Califano,* U.S.L.W. 2339 (D.C.Cir. Nov. 8, 1979). The First Circuit recently explained the reasons for this rule of proof:

As such, it addresses two problems that exist in most employment discrimination

cases: (1) direct evidence of discrimination is likely to be unavailable, and (2) the employer has the best access to the reasons that prompted him to fire, reject, discipline or refuse to promote the complainant. . . . Proof of the *McDonnell Douglas* -type prima facie case assures the plaintiff his day in court despite the unavailability of direct evidence, and entitles him to an explanation from the defendant-employer for whatever action was taken.

*Loeb v. Textron, Inc., supra* at 1014.

### 2. *Teamsters*

■ Another form of disparate treatment exists where the employer has regularly and purposefully treated women less favorably than men. Evidence proving "that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers," *Teamsters v. United States, supra* 431 U.S. at 360, 97 S.Ct. at 1867, will constitute a prima facie case as to unlawful discrimination against the particular plaintiff. Statistical evidence as well as evidence of overt and intentional discrimination can be evidence tending to prove such a pattern or practice. *Id.* at 337–40, 97 S.Ct. 1843. In *Teamsters,* as here, there were specific instances when applicants from the protected group were told that the defendant was not yet ready to hire them.[14] In this case there was also evidence of the CSC chairman's expressed opinion that female police officers would be a "luxury" and of his remark to plaintiff Hall that she was "just a pretty face."

■ The Superior Court thus erred in finding no evidence that officials of the city of Auburn had discouraged women in their pursuit of jobs as police officers.[15] In

14. The United States Supreme Court cited two specific examples of such discriminatory dissuasion—a black applicant was told, "I don't feel that the company is ready for this [a black driver] right now," while a Chicano applicant was told that his ethnicity was a strike against him because "there isn't a Chicano driver in the system [yet]." *International Brotherhood of Teamsters v. United States, supra* at 338 n. 19, 97 S.Ct. at 1856 n. 19.

15. On appeal, for the first time the city of Auburn argues that the Civil Service Commission was completely independent of and separate from the police chief and other agents of the city and that consequently plaintiffs' challenge to the CSC certification process cannot be based on any acts of the city or the police chief. However, we understand the thrust of plaintiffs' case to be an attack on the entire process by which the city of Auburn hires po-

*Teamsters*, the Supreme Court warned against an employer's "subtle discrimination" of discouraging applicants by his

consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups.

*Teamsters v. United States, supra* at 365, 97 S.Ct. at 1870. It is also noteworthy that height and weight requirements such as those imposed by the city of Auburn up until 1975 have been held to deter potential applicants. *Dothard v. Rawlinson,* 433 U.S. 321, 330, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (striking down height and weight requirements for prison guards). Indeed, the CSC's certification of Jean Greeley was restricted because she failed to meet the physical requirements, and eight other female applicants out of a total of thirteen were rejected for similar reasons.

 The height and weight requirements are significant in relation to the statistical evidence. Defendants argued, and the Superior Court agreed, that the number of females who applied for police jobs and the number screened by the CSC were too small to be of statistical significance and that the use of statistics regarding the percentage of women in service jobs in the Lewiston-Auburn area was impermissible. However, general population statistics have probative value where potential female applicants may have been deterred by the past practices of defendants.[16] Small statistical samples may become significant where the

small number of female applicants may be due to unequal recruitment and past discriminatory practices. *Boston Chapter NAACP, Inc. v. Beecher,* 504 F.2d 1017, 1020–21 (1st Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). Also, even if the statistical sample is small, the results can be probative if corroborated by evidence of intentional and overt discrimination. *Commonwealth v. Rizzo,* 466 F.Supp. 1219, 1232 (E.D.Pa.1979). *See also E. E. O. C. v. N. Y. Times Broadcasting Service, Inc.,* 542 F.2d 356, 360–61 (6th Cir. 1976). Still further, where there exists the "inexorable zero"—zero female police officers, zero female applicants fully certified by the CSC—the prima facie inference of discrimination becomes strong. *Teamsters v. United States, supra* 431 U.S. at 342 n. 23, 97 S.Ct. 1843; *Lee v. City of Richmond,* 456 F.Supp. 756, 767 (E.D.Va. 1978).

3. *Albemarle*

 A prima facie case of disparate impact is established where an employer's practice (such as a written or oral test, or a particular job requirement) is facially neutral but in fact affects more harshly one group than another. *Albemarle Paper Co. v. Moody, supra* 422 U.S. at 426, 95 S.Ct. 2362; *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Proof of disparate impact upon one group supports an inference of unlawful discrimination against a particular plaintiff who is a member of that group. The primary method of establishing a skewed selection process is by statistical evidence.

lice officers, and the city is responsible for whatever action, discriminatory or otherwise, is taken by any of its agents. *See Monell v. New York Dept. of Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**16.** Job advertisements similar to the one used to announce the 1978 job openings in the Auburn police department ("measuring up as a MAN"), see n. 2 above, have been held to discriminate on the basis of sex and to discourage potential applicants. *See Hailes v. United Airlines,* 464 F.2d 1006 (5th Cir. 1972). Even if

the offending 1978 advertisement appeared in its particular form otherwise than through the intentional act of an agent of the city of Auburn, it could well have effectively reduced the number of women applying for the advertised jobs. Furthermore, the Superior Court would be warranted in considering what, if any, affirmative duty the city had, when it discovered the offending ad published in its name, to dispel the inference that only males need apply for the police officer vacancies.

In this case the Superior Court rejected plaintiffs' disparate impact attack on the Auburn police hiring method, in part, because of an erroneous finding of fact. The court stated that in the previous five years, 20% of the female [17] and 18% of the male applicants had been certified by the CSC. However, the record clearly establishes that in the previous five years, 1974–78, only one out of thirteen female *applicants* (7.7%) had been certified, as opposed to 20% of the male applicants. It was in the previous *four* years, 1975–78, that 18% of the male applicants—and an "inexorable zero" percent of the female applicants—had been certified. The 20%–7.7% disparity is made even greater by the facts that Jean Greeley (who, alone, made up the 7.7% figure) was not given an unqualified certification and that by the then prevailing practice of the CSC her written score had been weighted more heavily than were the written scores of plaintiffs Hall and Bernard.

## C. *The Nature of the Evidence to Counter the Plaintiff's Prima Facie Case*

■ For each of the three types of prima facie cases, there is a particular kind of evidence that will counter it. Evidence of only a particular subject matter is appropriate to match the factual proof underlying the particular prima facie case. Thus, in a *McDonnell Douglas* disparate treatment case, the subject matter will be some legitimate, nondiscriminatory reason for defendant's conduct. *See Board of Trustees v. Sweeney, supra* 439 U.S. at 24–25, 99 S.Ct. 295; *King v. New Hampshire Dept. of Resources, Etc.*, 420 F.Supp. 1317, 1326–27 (D.N.H.1976), *aff'd*, 562 F.2d 80 (1st Cir.

1977). In a *Teamsters* pattern-or-practice case, the appropriate countering subject matter is a nondiscriminatory explanation for the apparently discriminatory pattern or practice constituting the prima facie case of unlawful discrimination. *Teamsters v. United States, supra* 431 U.S. at 360 n. 46, 97 S.Ct. 1843.

■ In an *Albemarle* disparate impact case, the countering subject matter is a job-related justification for the hiring practices having a disparate sex impact. For example, if employment tests, oral or written, are at issue, there must be evidence indicating by "professionally acceptable methods" that the employer's "discriminatory tests are . . . 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated'." [18] Or, if other hiring requirements or criteria, such as prior experience or strength, are at issue, there must be credible evidence that they are "necessary to safe and efficient job performance." [19] "The touchstone is business necessity . . .," *Griggs v. Duke Power Co., supra* 401 U.S. at 431, 91 S.Ct. 849, not mere business convenience. *See United States v. Jacksonville Terminal Co.*, 451 F.2d 418, 451 (5th Cir. 1971), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972).

■ It must be emphasized that in all of these contexts the ultimate burden of persuasion is never shifted from the plaintiff. Yet, if a judgment in favor of the plaintiff on the basis of his or her prima facie case alone is to be avoided, there must exist evidence having probative force as to the

---

17. The 20% figure was based upon an erroneous finding that only five women had applied in that period. See n. 9 above.

18. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975), quoting EEOC Guidelines, 29 CFR § 1607.4(c). Those guidelines were recently revised and amplified by the Uniform Guidelines on Employee Selection Procedures. *See* 43 Fed.Reg. 38,295 (1978). *See also United States v. City of Chicago*, 549 F.2d 415, 429–32 (7th Cir.), *cert. denied sub nom. Arado v. United States* and *Adams v. City of Chicago*, 434

U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Boston Chapter NAACP, Inc., v. Beecher*, 504 F.2d 1017, 1021–26 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

19. *Dothard v. Rawlinson*, 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977). *See United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 662 (2d Cir. 1971); *Robinson v. Lorillard*, 444 F.2d 791, 798 (4th Cir. 1971).

particular subject matter appropriate to counter the particular prima facie case.

■ In the case at bar plaintiffs have asserted that a requirement of prior police experience, even though facially neutral, is sex-discriminatory in its impact because until recently few women have been employed as police officers anywhere. *See Furnco Constr. Co. v. Waters*, 438 U.S. 567, 583, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (Marshall, J., concurring and dissenting); *Rowe v. General Motors Corp.*, 457 F.2d 348, 358 (5th Cir. 1972); *Freeman v. Motor Convoy, Inc.*, 409 F.Supp. 1100, 1116 (N.D.Ga. 1976). The Superior Court, however, ruled that prior police experience is a "bona fide job qualification." We do not understand that the Superior Court was using the term in a technical sense to refer to the bona-fide-occupational-qualification (bfoq) exception expressly carved out by both the Maine and the federal laws prohibiting employment discrimination. Under federal law the bfoq exception applies only where sex (or other prohibited basis for discrimination) is itself a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise."[20] The United States Supreme Court has held that the federal "bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson, supra* 433 U.S. at 334, 97 S.Ct. at 2729 (Alabama policy of not hiring women guards for "contact" positions in all-male penitentiaries held valid). Although the Maine bfoq exception is not as clearly stated as the federal exception,[21] no reason appears for the Maine legislature to use the technical term "bona fide occupational qualification" otherwise than in its technical meaning established in the federal statutory and case law. Thus, the bfoq exception is not available to defendants to justify their requiring, or giving a hiring advantage to, prior police experience.

■ However, any prima facie case of disparate impact from that practice is countered by credible evidence that prior police experience is "necessary to safe and efficient job performance"; that is, such experience is a "business necessity." *E. E. O. C. v. N. Y. Times Broadcasting Service, Inc., supra* at 361. This evidence must relate to the "business necessity" of prior police experience as distinguished from the mere advantage that prior experience offers in many hiring situations. Also, on rehearing, the practicality of training on the job and at the Maine Police Academy during the one-year probationary period will be relevant in applying the business necessity test.

■ The CSC's heavy reliance upon physical strength is another example of a facially neutral practice that may have a disproportionately harsh impact upon women. The conception of a police officer as necessarily aggressive, big, strong, and intimidating is a sex stereotype. The CSC chairman gave a low score to plaintiff Bernard because she was not the "rough-tough" type, and flatly stated that he gave all female applicants low scores because he assumed they could not handle a physical situation. However, once there is evidence constituting a prima facie case of disparate impact, to counter it there must be *credible evidence*, rather than the mere assumption,

---

**20.** Section 703(e) of Title VII, 42 U.S.C. § 2000e-2(e), provides in pertinent part:

(1) it shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business enterprise . . . . .

**21.** The Maine Human Rights Act, rather than stating the bfoq exception in a separate statutory provision as does the federal statute, inserted it without definition in 5 M.R.S.A. § 4572, which defines what is "unlawful employment discrimination." The pertinent language of section 4572(1) is as follows:

It shall be unlawful employment discrimination . . . *except where based on a bona fide occupational qualification* . . . [f]or any employer to fail or refuse to hire . . . any applicant for employment because of . . . sex . . . . .

(Emphasis added) *See* n. 1 above. *See also* 5 M.R.S.A. § 4572-A (1979).

that "all or substantially all" women would be unable to perform safely and efficiently the duties of a police officer. *See Weeks v. Southern Bell Tel. & Tel. Co.,* 408 F.2d 228, 235 (5th Cir. 1969); *Gunther v. Iowa State Men's Reformatory,* 462 F.Supp. 952, 956 (D.Iowa 1979).[22] The criterion or requirement of strength is justified only if job-related, *and* a test must be adopted and professionally validated to measure it directly.[23] It is improper to evaluate the individual applicant in the stereotypical abstract. *Dothard v. Rawlinson, supra* 433 U.S. at 331–33, 97 S.Ct. 2720.

■ Similarly, if the evidence constituting a prima facie case relates to oral interviews that have a disparate impact on women, the countering evidence must be professional testimony that the interview criteria are significantly related to or predictive of important elements of police work. *See Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 431, 95 S.Ct. 2362; *Allen v. City of Mobile,* 464 F.Supp. 433, 438–40 (S.D. Ala.1978); Uniform Guidelines on Employee Selection Procedures, 43 Fed.Reg. 38,295 (1978). Here, defendants have conceded that the oral interview was never validated to be job related. Additionally, federal courts have held criteria similar to those used by the CSC commissioners in evaluating applicants during the oral interviews (such as "appearance", "personality") to be subjective and very susceptible to partiality. *E. g., Ste. Marie v. Eastern R. Ass'n,* 458 F.Supp. 1147, 1154–56, 1162 (S.D.

N.Y.1978); *Wade v. Mississippi Coop. Extension Serv.,* 372 F.Supp. 126, 142 (N.D. Miss.1974), *aff'd in pert. part,* 528 F.2d 508, 518 (5th Cir. 1976); *United States v. Local 357,* 356 F.Supp. 104, 114–17 (D.Nev.1973). *See generally* Newman, "Remedies for Discrimination in Supervisorial and Managerial Jobs," 13 *Harv.C.R.–C.L.L.Rev.* 633, 636–46 (1978).

D. *The Plaintiff's Ultimate Burden of Persuasion*

■ When there exists credible evidence having probative force to counter evidence constituting a prima facie case of unlawful discrimination, the judge must move to the third step of evaluating the whole evidence. On a disparate treatment claim, he may be assisted in this third step evaluation by the existence of affirmative evidence that the nondiscriminatory reason offered by the defendant for rejecting the plaintiff is a pretext for what actually was a discriminatory purpose. *McDonnell Douglas Corp. v. Green, supra* 411 U.S. at 804, 93 S.Ct. 1817. Affirmative evidence of pretext includes facts as to prior instances of the defendant's discrimination against women and statistics as to the defendant's "policy and practice" of hiring or (as here) not hiring women. *Id.* at 804–05, 93 S.Ct. 1817. *See also Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106 (1st Cir. 1979) (affirming decision that female plaintiff proved defendant's justifications to be pre-

---

**22.** In the recent case of *Brace v. O'Neil,* 19 Empl.Prac.Dec. (CCH) ¶ 9012 (E.D.Pa. 2/14/79), the Philadelphia police department had refused to employ women as officers in the field, arguing, as here, that women were less able to make "physical" arrests. However, an independent nine-month study of male and female field officers found that in responding to actual street situations there either was no difference between male and female officers or, if any differences did exist, the female officers were generally *superior*; and that there were (1) no significant male-female difference regarding the making of arrests or willingness to confront suspects, (2) no difference in sick leave or injuries on duty, (3) no relationship between strength and performance, and (4) no significant relationship between height, weight, and performance.

**23.** Any physical tests used by defendants as part of their overall procedure to screen applicants must be job-related and must measure directly skills necessary for all police officers. *See Hardy v. Stumpf,* 21 Cal.3d 1, 145 Cal.Rptr. 176, 576 P.2d 1342 (1978); EEOC Decision No. 77–19, 2 *Empl. Prac. Guide* (CCH) ¶ 6568 (April 13, 1977). We agree that

[i]t is not enough that the [testing] device selects characteristics that may have some rational relationship to job performance; "a discriminatory employment practice must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge."

*Blake v. City of Los Angeles,* 595 F.2d 1367, 1377 (9th Cir. 1979), quoting *Dothard v. Rawlinson, supra* 433 U.S. at 332 n. 14, 97 S.Ct. 2720.

text). The judge may also be assisted in his evaluation by the strength of the inference of unlawful discrimination arising from the prima facie case, and by his assessment of the witnesses' credibility.

■■■■ On a disparate impact claim, even if there exists some evidence that the defendant's job requirements or tests are validated as job related, the judge may take into account the existence of affirmative evidence that the job requirements or tests are not job related or that they are not "predictive of or significantly correlated with important elements of work behavior." *See* note 18 above. Alternatively, there may be affirmative evidence that other selection devices, without a similarly undesirable racial or sexual effect, would also assure safe and effective work performance. *Albemarle Paper Co. v. Moody, supra* 422 U.S. at 425, 95 S.Ct. 2362. Such affirmative evidence would have probative force to show that the defendant was using his selection device as a "pretext" for discrimination. *Id.*

■■■■ The plaintiff's ultimate burden of persuasion does not require her to establish that she was rejected solely because of her sex; no more is required to be shown than that sex was a "but for" factor in her rejection. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). The Superior Court thus erred here in requiring plaintiffs Hall and Bernard to show that they were denied certification "merely" because they were female, an error similar to the one committed in the jury instruction in *Wells v. Franklin Broadcasting Corp., supra*, to the effect that Wells could prevail under the Maine Human Rights Act only if he proved his firing was "solely because of his age." *Id.* at 772. In *Wells*, this court held (subsequent to the Superior Court's decision in the case now at bar) that

> even if more than one factor affects the decision to dismiss an employee, the employee may recover if one factor is his age and in fact it made a *difference* in determining whether he was to be retained or discharged. If an employee

would not have been dismissed but for his age, the existence of other reasonable grounds for his discharge does not relieve the employer from liability under the applicable statutory provisions.

*Id.* at 773. Thus, if on the entirety of the evidence the judge concludes that the reasons claimed by defendants to be legitimate, nondiscriminatory reasons for the rejection of plaintiffs were in fact pretexts for discrimination—that their sex was a determinative factor in that rejection—then plaintiffs have met their ultimate burden to prove employment discrimination.

## III.

We hold that the prima facie case standard, as developed by the specialized body of case law under the parallel federal employment discrimination statutes, is the proper method for evaluating the evidence presented at the trial of cases arising under the Maine Human Rights Act. The judgment entered below in favor of defendants was based upon a legal analysis at odds with that standard. It thus cannot stand. On any rehearing, the Superior Court should apply to the whole evidence presented by the parties the three-stage evaluation described in this opinion.

The entry will be:

Appeal sustained.

Judgment for defendants vacated.

Case remanded for further proceedings consistent with the opinion herein.

Costs on appeal allowed to appellants.

ARCHIBALD and GLASSMAN, JJ., did not sit.