LEVY, J.,
with whom GORMAN and JABAR, JJ., join,
dissenting.
[¶ 38] I agree with the Court’s conclusion that the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4551^634 (2007), does not make participation in the Section 8 housing assistance program mandatory, *65 and that the MHRA prohibits landlords from intentionally discriminating against recipients of public assistance. However, I conclude that the MHRA prohibits housing practices that have a disparate impact on recipients of public assistance when such decisions are not justified by a business necessity. I also disagree with the Court’s conclusion that Coach Lantern did not “refuse to rent” to Dussault for purposes of section 4582. For these reasons, I respectfully dissent.
A. Whether Coach Lantern “Refused to Rent” to Dussault
[¶ 39] Before discussing why disparate impact liability applies in this case, it is necessary to address the threshold question of whether Coach Lantern’s actions exposed it to liability pursuant to the MHRA. The MHRA deems it unlawful “to refuse to rent or impose different terms of tenancy” primarily because of an individual’s status as a recipient of public assistance. 5 M.R.S. § 4582. The Court concludes that Coach Lantern did not “refuse to rent” to Dussault because Coach Lantern expressed its willingness to rent to her so long as it could do so without including the HUD tenancy addendum in its lease. Court’s Opinion ¶ 16. The Court relies heavily on our holding in Catir v. Commissioner of the Department of Human Services, 543 A.2d 356, 357-58 (Me.1988), which was decided before the “business necessity” defense was added to section 4583 in 2007. See P.L. 2007, ch. 243, § 4 (effective Sept. 20, 2007). In Ca-tir, we upheld a summary judgment for a nursing home that terminated its participation in the Medicaid program because “there [was] no allegation or suggestion that the nursing home ‘refuse[d] to rent or imposefd] different terms of tenancy* on Medicaid recipients” by making them pay the same higher rate as non-Medicaid patients. 543 A.2d at 357-58 (first alteration added) (quoting 5. M.R.S.A. § 4582 (Pamph.1987)).
[¶ 40] Catir is inapposite to the present case for several reasons. First, our opinion stated that the material facts were “undisputed,” id. at 357, and that the “plaintiffs’ affidavits clearly establish that the nursing home refused to accept the lower Medicaid payment and subjected the recipients to the same terms of tenancy offered to any other individual,” id. at 358 (emphasis added). Thus, the summary judgment record demonstrated that the nursing home’s refusal to serve the plaintiffs as Medicaid patients was not based on the plaintiffs’ status as recipients of public assistance, but was instead based on its decision to no longer accept the Medicaid reimbursement rate. Because Catir was decided before the business necessity exception was added to section 4583, we had no reason to consider whether the nursing home’s refusal to accept the Medicaid reimbursement rate was based on business necessity.
[¶41] Second, the more fundamental issue in Catir was not whether the nursing home “refuse[d] to rent” to its Medicaid recipients, but whether it “impose[d] different terms of tenancy” on them by making them pay the higher private rate that non-Medicaid patients paid. In holding that the nursing home had not imposed different terms of tenancy, we noted that “[t]he equality of housing access secured by the Maine Human Rights Act is premised upon the assumption that the persons seeking the housing have the ability to pay.” 543 A.2d at 358. In contrast with the plaintiffs’ presumed inability to pay the higher private rate at issue in Catir, there is no dispute here that Dussault, with the assistance of the Section 8 housing subsidy, had the ability to pay the rent asked by Coach Lantern.
*66 [¶ 42] In extending Catir so that it controls the outcome of this case, the Court adopts too narrow a view of what it means for a landlord to “refuse to rent” to a prospective tenant. Here, Coach Lantern would not rent an apartment to Dussault so long as the HUD tenancy addendum was included in the lease. Therefore, regardless of the reason for its refusal, Coach Lantern “refused to rent” to Dus-sault pursuant to the plain language of section 4582. The Court’s characterization of Coach Lantern as being “willing” to rent to Dussault is misplaced, for Coach Lantern was “willing” to rent to Dussault only if she relinquished her status as a recipient of public assistance. Court’s Opinion ¶ 16. The Court’s interpretation of section 4582 would effectively sanction a landlord’s refusal to rent to a tenant based on the tenant’s protected status so long as the landlord simply asserted that it was “willing” to accept the tenant should she change her status.
[¶ 48] On the facts before us, I conclude that Coach Lantern “refused to rent” to Dussault pursuant to section 4582. I now turn to whether Coach Lantern’s refusal to rent was “primarily because of’ Dussault’s status as the recipient of public assistance.
B. Disparate Impact Liability Pursuant to the MHRA
[¶ 44] The MHRA makes it unlawful “to refuse to rent ... to any individual ... primarily because of the individual's status as [a] recipient” of public assistance. 5 M.R.S. § 4582. The Court construes the phrase “primarily because of’ to proscribe only intentional discrimination against recipients of public assistance, and not housing decisions that have a disparate impact on such recipients. This construction, which was not argued by Coach Lantern before the Superior Court or this Court, is contrary to sections 4582 and 4583.
1. The Plain Meaning of Sections 4582 and 4583 Recognizes Disparate Impact Liability
[¶45] “When construing the language of a statute, we look first to the plain meaning of the language to give effect to the legislative intent.” Stromberg-Carlson Corp. v. State Tax Assessor, 2001 ME 11, ¶ 9, 765 A.2d 566. A statute’s plain meaning must be considered through the lens of “the whole statutory scheme for which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved.” Id (quotation marks omitted). To give effect to the intent of the Legislature, “[w]ords must be given meaning and not treated as meaningless and superfluous.” Id.
[¶ 46] The question before us is what it means for a landlord to refuse to rent to a tenant “primarily because of’ the tenant’s status as a recipient of public assistance pursuant to section 4582. The Court’s holding — that “primarily because of,” on its face, only prohibits housing decisions that are intentionally discriminatory — misreads the statute. Whether a housing decision is “primarily because of’ a tenant’s protected status can mean either (1) that the decision had a discriminatory purpose, or (2) that the decision resulted in a disparate impact on members of a protected group that was functionally equivalent to intentional discrimination. “ ‘[T]he necessary premise of the disparate impact approach is that some [housing] practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination.’” Mountain Side Mobile Estates P’ship v. Sec’y of Hous. & Urban Dev., 56 F.3d 1243, 1250-51 (10th Cir.1995) (quot *67 ing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)) (second alteration in original). This construction accords with the Supreme Court’s adoption of disparate impact liability in the face of statutory language that, as is true here, does not explicitly mention disparate impact liability. See Griggs v. Duke Power Co., 401 U.S. 424, 429-36, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (holding that disparate impact liability is contemplated by Title VII’s prohibition on employment tests that are “‘designed, intended or used to discriminate because of race’ ”) (quoting the Civil Rights Act of 1964, Pub.L. No. 88-352, § 703(h), 78 Stat. 241, 257 (codified as amended at 42 U.S.C.A. § 2000e-2 (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13))).
[¶ 47] This construction of section 4582 is confirmed by viewing it in conjunction with the business necessity defense established in section 4583. Section 4583 dictates that the MHRA must be construed to permit housing practices that are both (1) “consistent with business necessity” and (2) “not based on” an individual’s status as a member of a protected class, including recipients of public assistance:
Nothing in this Act may be construed to prohibit or limit the exercise of the privilege of every person and the agent of any person having the right to sell, rent, lease or manage a housing accommodation to set up and enforce specifications in the selling, renting, leasing or letting ... of facilities ... that are consistent with business necessity and are not based on the race, color, sex, sexual orientation, physical or mental disability, religion, country of ancestral origin or familial status of or the receipt of public assistance payments by any prospective or actual purchaser, lessee, tenant or occupant.
5 M.R.S. § 4583. Section 4583 creates a defense to liability pursuant to the MHRA that is relevant only if a housing decision is “not based on” a protected status, i.e., if the decision is not purposefully discriminatory but nonetheless has a disparate impact on a protected class. The business necessity defense is specifically tailored to defending against claims of disparate impact liability. See Me. Human Rights Comm’n v. Can. Pac. Ltd., 458 A.2d 1225, 1233 n. 16 (Me.1983) (“[The business necessity defense] is thus available only to validate uniform employment criteria having a discriminatorily disparate impact.”); Me. Human Rights Comm’n v. City of Auburn, 408 A.2d 1253, 1264-66 (Me.1979) (citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 425-34, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), and Griggs, 401 U.S. at 431, 91 S.Ct. 849, for the proposition that a plaintiffs prima facie case of disparate impact may be countered by a showing of business necessity). Thus, a facially neutral housing practice that has a disparate impact on a protected group is not discriminatory if it is “consistent with business necessity.” 5 M.R.S. § 4583.
[¶ 48] Any doubt as to the proper construction of sections 4582 and 4583 is erased by the statute’s legislative history.[8] *68 The 2007 amendment to the MHRA that, among other things, added the “business necessity” language to section 4583 expressly states that it “amends the Maine Human-Rights Act to ... prohibit unreasonable housing practices that have a disparate impact on the basis of ... the receipt of public assistance payments.” L.D. 685, Summary (123rd Legis.2007); P.L. 2007, ch. 243, § 4 (effective Sept. 20, 2007) (codified at 5 M.R.S. § 4583 (2012)). The Legislature’s intent to subject claims of housing discrimination based on the receipt of public assistance payments to disparate impact analysis, and to permit landlords to justify their practices based on a showing of business necessity, could not be clearer.[9]
2. The MHRA’s Recognition of Disparate Impact Liability Does Not Make Participation in Section 8 Mandatory
[¶ 49] I agree with the Court that the MHRA does not make landlords’ participation in the Section 8 housing voucher program mandatory. Nothing in the construction of the MHRA set out above requires landlords to participate in the Section 8 program. Rather, the statute simply prohibits landlords from discriminating, either in word or in effect, against recipients of public assistance. The Legislature’s provision for these two forms of liability cannot be properly understood as making participation in Section 8 mandatory.
[¶ 50] The concurrence, in arguing that the MHRA does not compel participation in Section 8, places significant weight on the fact that in 2007 the Judiciary Committee struck a proposed amendment to 5 M.R.S. § 4582 that would have made it unlawful for landlords to refuse to rent or impose different terms of tenancy to any recipient of public assistance “primarily because of the individual’s status as recipient or because of any requirement of such a public assistance program.” See L.D. 685 (123rd Legis.2007); Comm. Amend. A to L.D. 685, No. S-162 (123rd Legis.2007). The legislative history is silent as to why the Judiciary Committee decided to remove the proposed language from the enacted law, and any number of inferences can be drawn from the Committee’s decision.[10] Further, this 2007 amendment to *69 the MHRA is the very same one cited above that demonstrates the Judiciary Committee’s desire, in no uncertain terms, to subject unreasonable housing practices to disparate impact liability. See L.D. 685, Summary (123rd Legis.2007).
3. Federal Law Supports an Interpretation of Section 4582 that Creates Disparate Impact Liability
[¶ 51] A construction of sections 4582 and 4583 that recognizes disparate impact liability is also supported by federal law. “In enacting the Human Rights Act, Maine was legislating against the background of prior federal antidiscrimination statutes and a developing body of case law construing and applying those statutes.” City of Auburn, 408 A.2d at 1261 (footnote omitted). Accordingly, we look to federal case law to “provide significant guidance in the construction of our statute.” Id. (quoting Me. Human Rights Comm’n v. Local 1361, 383 A.2d 369, 375 (Me.1978)).
[¶ 52] The federal counterpart to the MHRA’s fair housing provisions is the Fair Housing Act (FHA), 42 U.S.C.A. §§ 3601-3631 (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13). The FHA provides that “it shall be unlawful ... [t]o refuse to sell or rent ... or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.” Id. § 3604(a) (emphasis added). Even though the words “because of’ can be read to suggest solely intentional discrimination, every federal court of appeals but one has concluded that this FHA provision creates liability for intent-neutral disparate impact. See, e.g., Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly, 658 F.3d 375, 381-82 (3d Cir.2011); Gallagher v. Magner, 619 F.3d 823, 833-38 (8th Cir.2010); Reinhart v. Lincoln Cnty., 482 F.3d 1225, 1229 (10th Cir.2007); Tsombanidis v. W. Haven Fire Dep’t, 352 F.3d 565, 573 (2d Cir.2003); Langlois v. Abington Hous. Auth., 207 F.3d 43, 49 (1st Cir.2000); Gamble v. City of Escondido, 104 F.3d 300, 304-05 (9th Cir.1997); Simms v. First Gibraltar Bank, 83 F.3d 1546, 1555 (5th Cir. 1996); Smith & Lee Assocs., Inc. v. City of Taylor, 102 F.3d 781, 790 (6th Cir.1996); Knapp v. Eagle Prop. Mgmt. Corp., 54 F.3d 1272, 1280 (7th Cir.1995); Jackson v. Okaloosa Cnty., 21 F.3d 1531, 1543 (11th Cir.1994); Betsey v. Turtle Creek Assocs., 736 F.2d 983, 986 (4th Cir.1984). But see Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep’t of Hous. and Urban Dev., 639 F.3d 1078, 1085 (D.C.Cir.2011) (declining to decide whether the FHA permits disparate impact claims as to grant administration, but assuming that it does). The nearly unified view of the federal courts further supports the construction of sections 4582 and 4583 that recognizes disparate impact liability in housing discrimination. See City of Auburn, 408 A.2d at 1261.
*70 C. Summary Judgment
[¶ 58] Because sections 4582 and 4588 recognize disparate impact liability, it is necessary to review the grant of summary judgment in favor of Coach Lantern on Dussault’s claim of disparate impact.
[¶ 54] In analyzing a claim of disparate impact, courts employ a burden-shifting analysis similar to that employed when analyzing a claim of disparate treatment. See City of Auburn, 408 A.2d at 1264-65 (adopting this analysis in the employment discrimination context); see also Mountain Side Mobile Estates P’ship, 56 F.3d at 1250-54; Huntington Branch, N.A.A.C.P. v. Town of Huntington, 844 F.2d 926, 935-39 (2d Cir.1988), aff'd per curiam on other grounds, 488 U.S. 15, 18, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). The first step of the analysis requires the party alleging discrimination to provide prima facie evidence that a facially neutral practice affects one group more harshly than another. City of Auburn, 408 A.2d at 1264. If the plaintiff produces a prima facie case, the burden of production shifts to the defendant to produce “credible evidence” of a genuine business necessity for the challenged practice. Id. at 1264-66. If the defendant meets that burden, the burden shifts back to the plaintiff to “show that the defendant was using his selection device as a pretext for discrimination.” Id. at 1268 (quotation marks omitted). At all times, the ultimate burden of persuasion rests with the plaintiff. Id. at 1265.
[¶ 55] Here, Dussault satisfies the first step of the analysis: Coach Lantern’s refusal to include the HUD tenancy addendum in its leases effectively excludes one hundred percent of Section 8 recipients from renting from Coach Lantern. See 24 C.F.R. § 982.308(b)(2) (2013) (requiring inclusion of HUD-prescribed addenda on all leases). As we have said in the employment setting, where the “ ‘inexorable zero’ ” exists, “the prima facie inference of discrimination becomes strong.” City of Auburn, 408 A.2d at 1264 (quoting Int’l Bhd. of Teamsters v. United States, 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Because Dussault presented prima facie proof of discrimination, the burden shifted to Coach Lantern to produce evidence that its decision to not include the HUD tenancy addendum in its leases was justified by “credible evidence” of business necessity. Id. at 1265. This presents the question of what constitutes a “business necessity” pursuant to section 4583.
[¶ 56] The idea that a business necessity can justify a practice having a disparate impact on a protected class originated in the context of federal employment discrimination law. See Griggs, 401 U.S. at 431, 91 S.Ct. 849. Federal courts have developed definitions of “business necessity” that inform the meaning of the term within the context of housing discrimination law. See, e.g., Mountain Side Mobile Estates P’ship, 56 F.3d at 1254. Similarly, our employment discrimination case law provides guidance as to what should constitute a “business necessity” for purposes of section 4583.[11] In the employment discrimi *71 nation context, we have interpreted “business necessity” to require, among other things, that an employment practice be “ ‘necessary to safe and efficient job performance,’ ” and not be done out of “mere business convenience.” City of Auburn, 408 A.2d at 1265 (quoting Dothard v. Rawlinson, 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977)). In other words, the challenged practice must be shown by “credible evidence,” id., to be necessary to achieve a lawful and substantial nondiscriminatory interest of the defendant. This approach is consistent with that taken in the federal rule recently adopted to implement the FHA’s discriminatory effects standard. See Implementation of the Fair Housing Act’s Discriminatory Effects Standard, 78 Fed.Reg. 11,460, 11,482 (Feb. 15, 2013) (to be codified at 24 C.F.R. pt. 100). Applying this approach to section 4583, a business necessity is established when the challenged housing practice is not based on a protected status, and credible evidence demonstrates that the practice is necessary to achieve a “substantial, legitimate, nondiscriminatory interest” of the defendant. Id. at 11,460.
[¶ 57] Here, Coach Lantern’s statement of material facts listed nine requirements of the HUD tenancy addendum that it finds objectionable. It then asserted, in paragraph 25, that “Coach Lantern is unwilling to attach the [Section 8] Addendum to any of its leases because of the number of burdensome conditions contained therein and the fact that the Addendum alters a landlord’s rights under state law.” Although Coach Lantern summarized the conditions of the addendum that it objects to, it failed to assert facts from which a fact-finder could determine that the conditions would interfere with any substantial, legitimate, and nondiscriminatory interest associated with its business. Coach Lantern did not identify which addendum provisions differed from its own lease provisions, and it further failed to include a copy of its standard lease in the summary judgment record. Because of this, it is impossible to identify the actual differences between Coach Lantern’s lease agreement and the Section 8 addendum. Similarly, Coach Lantern failed to identify which of its rights pursuant to state law would be altered if it were bound by a Section 8 addendum and the extent to which the alteration of those rights would interfere with the safe and efficient operation of its business.
[¶ 58] Contrary to the Court’s approach, whether a housing practice qualifies as a business necessity is a fact-intensive issue that the law requires the landlord to prove by credible evidence, not simply allege. Where the proffered justification for a landlord’s housing practice (here, Coach Lantern’s assertion that provisions of the HUD tenancy addendum are unduly onerous) applies exclusively and completely to a class of individuals who share a status protected by the MHRA (here, Dussault and all other recipients of Section 8 housing subsidies), only a fact-finder can determine whether the housing practice in fact qualifies as a business necessity and is not based on the individuals’ protected status. Coach Lantern’s statement of material facts does no more than assert that it objects to certain requirements of the addendum without offering any information from which a fact-finder could determine whether Coach Lantern’s objection is based on “mere business convenience” or an actual business necessity. One can only speculate, for example, whether Coach Lantern will incur increased operating expenses if it adopts the addendum, and, if so, whether the increased expenses will be sufficiently substantial as to jeopardize the “safe and efficient” operation of its rental business. City of Auburn, *72 408 A.2d at 1265 (quotation marks omitted).
[¶ 59] Accordingly, Coach Lantern did not meet its burden of showing that an actual business necessity justified its decision to refuse to include Section 8 addenda in its lease agreements. Because Dussault made an unrebutted prima facie case of disparate impact discrimination, her motion for summary judgment should have been granted and Coach Lantern’s motion for summary judgment should have been denied. See Mountain Side Mobile Estates P’ship, 56 F.3d at 1254.
D. Conclusion
[¶ 60] With certain exceptions not applicable here, Maine landlords are required to comply with the Maine Human Rights Act. The Act does not compel landlords to participate in the Section 8 housing voucher program so long as the landlord’s decision does not intentionally discriminate against, or result in a disparate impact on, recipients of public assistance. If a landlord’s refusal to rent to recipients of public assistance has a disparate impact on such individuals, the landlord must have a legitimate, non-discriminatory reason — “business necessity” — for doing so. 5 M.R.S. § 4583. Because Dussault made an unre-butted prima facie case of discrimination based on Coach Lantern’s refusal to rent to her, I would vacate the judgment and remand for entry of a judgment in favor of Dussault and for a determination of her remedies.

. The majority concludes that 5 M.R.S. § 4582 (2007) unambiguously precludes disparate impact liability, and accordingly excludes 5 M.R.S. § 4583 (2007)’s legislative history from its analysis. This construction of section 4582 conflicts with the business necessity defense — a defense specifically tailored to defend against claims of disparate impact liability — established by section 4583. At the very least, there exists ambiguity in the statute that requires consultation of the relevant legislative history. Because the "primary purpose in statutory interpretation is to give effect to the intent of the Legislature,” Arse-nault v. Sec'y of State, 2006 ME 111, ¶ 11, 905 A.2d 285, the proper construction of the stat *68 ute must recognize that the Legislature expressly provided that the business necessity defense is available to defend against disparate impact claims based on "the receipt of public assistance payments by any prospective or actual purchaser, lessee, tenant or occupant.” 5 M.R.S. § 4583.

. The Court’s assertion that the Legislature "would have effectively overruled our holding in Catir ” by creating disparate impact liability pursuant to section 4582 is incorrect. See Court’s Opinion ¶ 28. As discussed above, our holding in Catir was sufficiently distinguishable — and cursory — that the Legislature’s contemplation of disparate impact liability in section 4582 did not infringe upon our holding in that case. See Catir v. Comm'r of Dep't of Human Servs., 543 A.2d 356, 357-58 (Me.1988).

. It is important to note that Section 8 housing assistance is one of many "federal, state or local assistance” programs to which former section 4582 applied. Therefore, one interpretation of the Judiciary Committee’s decision not to adopt the proposed change to section 4582 is that it was concerned about the consequences the change might have with respect to public assistance programs other than Section 8. The Judiciary Committee might also have concluded that the separate provision for disparate impact liability in L.D. 685, pursuant to section 4583, was sufficient to ameliorate concerns regarding landlords refusing to rent to tenants because of the requirements of participating in the Section 8 program. See Letter from Maine Human Rights Commission to Members of Joint Standing Committee on Judiciary 2 (April 5, 2007) (proposing amending section 4582 in order to "ensure that a housing provider can *69 not refuse to rent or impose different terms of tenancy because of the requirements of a public assistance program”). Finally, the Judiciary Committee might have concluded that the proposed amendment to section 4582 to add “any requirement of such a public assistance program” was not needed because a refusal to rent or imposition of different tenancy terms on that basis was already encompassed by the existing statutory language, "primarily because of the individual’s status as recipient.” The letter of the Executive Director of the Maine Human Rights Commission addressed to the Judiciary Committee that accompanied L.D. 685 suggested this very possibility. See Letter from Maine Human Rights Commission to Members of Joint Standing Committee on Judiciary 2 (April 5, 2007) (noting that the "recurring problem [of] landlords arguing that they do not want to do paperwork or comply with other requirements of public assistance programs such as Section 8 ... arguably would violate the existing language” of section 4582).

. At least one commentator has argued that although the definitions of "business necessity” created in employment law tend to inform the definitions adopted in housing law, housing law should apply a stricter standard. See Lindsey E. Sacher, Note, Through the Looking Glass and Beyond: The Future of Disparate Impact Doctrine Under Title VIII, 61 Case W. Res. L.Rev. 603, 636 (2010) ("[T]he differences between housing and employment suggest that given the limited number of legitimate justifications for denying housing to a qualified applicant, [housing discrimination] defendants should bear a higher burden than [employment discrimination defendants] when seeking to rebut a prima facie case of disparate impact.”).