Majority: SAUFLEY, C.J., and ALEXANDER, SILVER, and MEAD, JJ.
Concurrence: ALEXANDER. J.
Dissent: LEVY, GORMAN, and JABAR, JJ.
SILVER, J.
[¶ 1] Nicole Dussault appeals from a summary judgment entered in the Superi- or Court (Cumberland County, Cole, J.) in favor of RRE Coach Lantern Holdings, LLC, and Resource Real Estate Management, Inc. (collectively, Coach Lantern). Dussault claims that Coach Lantern’s policy of not including in its standard lease a tenancy addendum that binds the landlord to the requirements of the federal government’s Section 8 Housing Choice Voucher Program constitutes unlawful discrimination on the basis of her status as a public assistance recipient in violation of 5 M.R.S. § 4582 (2007)[1] of the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4551-4684 (2007). She also argues that the court erred by granting Coach Lantern’s motion for summary judgment and denying her cross-motion for summary judgment based on three theories of discrimination: direct evidence, disparate treatment, and disparate impact. We disagree and affirm the judgment.
I. FACTUAL AND LEGAL BACKGROUND
[¶ 2] The following facts are drawn from the summary judgment record and are not disputed by the parties. Nicole *56 Dussault and her three children became homeless in June 2008 following a foreclosure on Dussault’s home. On July 14, 2008, Dussault was issued a voucher pursuant to the Section 8 Housing Choice Voucher Program by Avesta Housing, a nonprofit organization that administers the federal voucher program as a contract agent for the Maine State Housing Authority.[2] Through the voucher program, the Housing Authority provides assistance to people with low incomes by subsidizing rent. The Housing Authority pays a portion of the voucher recipient’s rent each month directly to the landlord for a unit of the recipient’s choosing. See 24 C.F.R. § 982.1 (2013). The Housing Authority calculates an amount of rent for which the recipient is responsible, which is usually equal to thirty percent of the recipient’s adjusted income as defined by statute. See 42 U.S.C.A. §§ 1437a(b)(5), 1437f(o)(2)(A)-(B) (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13). Federal law explicitly makes landlords’ participation in the voucher program voluntary. See 24 C.F.R. § 982.302(b) (2013) (“If the family finds a unit, and the owner is willing to lease the unit under the program, the family may request [Housing Authority] approval of the tenancy.” (emphasis added)).
[¶ 3] Dussault sought housing in Scarborough in order to maintain her son’s placement in the school system there. Through Craigslist, Dussault found a listing for a three-bedroom apartment in the Coach Lantern Apartments in Scarborough with an advertised rent that was within the voucher program limits. The apartment is owned by RRE Coach Lantern Holdings, LLC, of which Resource Real Estate Management, Inc., is an affiliate.
[¶ 4] On August 5, 2008, Dussault called Coach Lantern to inquire about renting the apartment. Dussault alleges that after she disclosed that she would be using a voucher to pay the rent, she was told that Coach Lantern does not accept vouchers. She alleges that her caseworker at Avesta Housing was told the same thing by Coach Lantern when the caseworker inquired on Dussault’s behalf. Approximately two weeks later Dussault again called Coach Lantern to inquire about the apartment, but she did not mention that she would be using a voucher. After arranging an appointment and being shown the apartment, Dussault was given a rental application. A Coach Lantern employee encouraged her to fill it out. Two days later a Coach Lantern representative called Dussault to ask if she planned to submit the application. Dussault did submit an application, and on it she disclosed that she would be using a voucher. Dussault qualified for an apartment and “was accepted.”
[¶ 5] Dussault’s Avesta caseworker sent Coach Lantern a “landlord packet” indicating that in order for Dussault to be able to use her voucher, Coach Lantern would have to include a HUD tenancy addendum in her lease. Federal regulations require any landlord that accepts a housing voucher to include the tenancy addendum in its lease. 24 C.F.R. § 982.308(f) (2013). The addendum sets *57 forth the program requirements for participating landlords and tenants. Id.; see also 24 C.F.R. §§ 982.308-.310 (2013). The caseworker informed Coach Lantern that paperwork would need to be filled out before a HUD-mandated property inspection could take place, and that the paperwork and inspection process “could take a couple of weeks.”
[¶ 6] Coach Lantern, through its attorney, contacted Avesta Housing by letter dated September 3, 2008, to state its “problem with the inclusion of a Tenancy Addendum with [the standard] lease” and to see whether it could rent to Dussault without including the addendum in her lease. The letter stated, “I wish to make it absolutely clear that my client is not refusing to rent to [Dussault] primarily because she is a recipient of public assistance,” but because “[t]he addendum includes more restrictive rights and obligations on the landlord th[a]n the standard lease that they use, and my client does not wish to be bound by these more restrictive obligations.” Avesta Housing replied by email dated September 12, 2008, that Coach Lantern could not rent to Dussault without including the addendum.
[¶ 7] Coach Lantern is unwilling to include the addendum in any of its leases. Specifically, Coach Lantern finds it unacceptable that pursuant to the addendum the landlord agrees (1) to maintain the unit and premises in accordance with the housing quality standards set by the Housing Authority; (2) not to raise the rent during the initial term of the lease; (3) to charge a “reasonable” rent, as determined by the Housing Authority in accordance with HUD requirements, during the lease term; (4) not to evict the tenant or terminate the lease solely because the Housing Authority has failed to pay the subsidized portion of the rent; (5) not to evict a tenant who is a victim of domestic violence based on acts of domestic violence committed against her, unless the landlord can demonstrate an actual and imminent threat to other tenants or employees; (6) to open the premises to inspection by a Housing Authority inspector at the beginning of the lease, upon any complaint by the tenant, or after the landlord has remedied a problem identified by an inspector in a prior inspection; and (7) to notify the Housing Authority at least sixty days prior to any rent increase.
[¶ 8] Dussault was unable to afford the apartment without using the voucher. Because she could not use the voucher unless Coach Lantern included the addendum in her lease, she did not rent the apartment. She could not find housing in Scarborough and ultimately moved to South Portland. Dussault does not intend to seek housing at any Coach Lantern property in the future.
II. PROCEDURAL BACKGROUND
[¶ 9] In November 2008, Dussault filed a complaint with the Maine Human Rights Commission (Commission), alleging that Coach Lantern’s policy of refusing to include the HUD tenancy addendum in her lease, and therefore its refusal to participate in the voucher program, constitutes discrimination against Dussault on the basis of her status as a public assistance recipient in violation of the MHRA. After an investigation, the Commission voted unanimously at a hearing on April 13, 2009, that there were reasonable grounds to believe that Coach Lantern discriminated against Dussault because of her status as a recipient of public assistance.
[¶ 10] Dussault then filed a complaint in the Superior Court seeking declaratory and injunctive relief and damages. Coach Lantern filed a motion for summary judg *58 ment and Dussault filed a cross-motion.[3] The court granted Coach Lantern’s motion and denied Dussault’s motion, ruling in favor of Coach Lantern on each of three theories of discrimination. First, the court determined that there was no direct evidence of discrimination, and thus declined to perform a mixed-motive analysis. Next, the court concluded that Dussault failed to meet her burden, as part of the three-step, burden-shifting test that applies when there is no direct evidence of discrimination, to produce sufficient evidence that Coach Lantern’s proffered reasons for refusing to participate in the voucher program were pretextual. Finally, in performing a discriminatory impact analysis, the court concluded that Coach Lantern’s policy affects recipients of public assistance more harshly than housing applicants who do not intend to use vouchers, but that the policy is justified by a business necessity.
[¶ 11] Dussault timely appealed.
III. DISCUSSION
A. Standard of Review
[¶ 12] We review the court’s interpretation and application of the MHRA de novo. See Russell v. ExpressJet Airlines, Inc., 2011 ME 123, ¶ 16, 32 A.3d 1030. “We review the court’s ruling on cross-motions for summary judgment de novo.... ” F.R. Carroll, Inc. v. TD Bank, N.A., 2010 ME 115, ¶8, 8 A.3d 646. “Summary judgment is appropriate if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law.” Id. (quotation marks omitted).
B. The Maine Human Rights Act
[¶ 13] The MHRA declares that individuals have a civil right to “[t]he opportunity ... to secure decent housing in accordance with [their] ability to pay, and without discrimination because of race, col- or, sex, sexual orientation, physical or mental disability, religion, ancestry, national origin or familial status.” 5 M.R.S. § 4581.[4] Although the MHRA does not reference status as a recipient of public assistance in this declaration, see id., the MHRA does provide certain protections to public assistance recipients. Section 4582 provides in relevant part:
It is unlawful housing discrimination, in violation of this Act...
[f]or any person furnishing rental premises or public accommodations to refuse to rent or impose different terms of tenancy to any individual who is a recipient of federal, state or local public assistance, including medical assistance and housing subsidies primarily because of the individual’s status as recipient. ...
5 M.R.S. § 4582. Section 4583, however, provides in relevant part:
Nothing in this Act may be construed to prohibit or limit the exercise of the privilege of every person and the agent of any person having the right to sell, rent, lease or manage a housing accommodation to set up and enforce specifications in the selling, renting, leasing or letting or in the furnishings of facilities or services in connection with the facilities that are consistent with business *59 necessity and are not based on the race, color, sex, sexual orientation, physical or mental disability, religion, country of ancestral origin or familial status of or the receipt of public assistance payments by any prospective or actual purchaser, lessee, tenant or occupant.
5 M.R.S. § 4588. Together these sections establish that a landlord may not refuse to rent to, or impose different terms of tenancy on, a recipient of public assistance who is an otherwise-eligible tenant primarily on the basis of that person’s status as a recipient unless the landlord can demonstrate a business necessity that justifies the refusal.
[¶ 14] In construing a statute, we seek to give effect to the Legislature’s intent. See Eagle Rental, Inc. v. State Tax Assessor, 2013 ME 48, ¶ 11, 65 A.3d 1278. We look beyond the plain language of the statute to other indicia of legislative intent only if the statute is ambiguous. See id.; Fuhrmann v. Staples the Office Superstore E., Inc., 2012 ME 135, ¶ 23, 58 A.3d 1083. The only discrimination that the MHRA prohibits with respect to public assistance recipients is “refus[al] to rent or imposition of] different terms of tenancy” based primarily on a person’s status as a recipient. 5 M.R.S. § 4582. This language stands in contrast to the broader prohibition against housing discrimination on other bases, which makes it a violation of the MHRA to “refuse to show or refuse to sell, rent, lease, let or otherwise deny to or withhold from any individual housing accommodation because of the race or col- or, sex, sexual orientation, physical or mental disability, religion, ancestry, national origin or familial status of the individual.” Id. (emphasis added).
[¶ 15] We previously construed the MHRA’s prohibition of “unlawful housing discrimination” based on receipt of public assistance in Catir v. Commissioner of the Department of Human Services, 543 A.2d 356, 357-58 (Me.1988). In Catir, a nursing home that had accepted state and federal Medicaid reimbursement stopped participating in the program and informed residents that it would no longer keep residents who were unable to pay the higher, private rate. Id. at 357. Residents receiving Medicaid sued, seeking a declaration that the nursing home was obligated to accept Medicaid reimbursement. Id. We upheld summary judgment for the nursing home, reasoning that it was not unlawful discrimination for the nursing home to stop participating in the Medicaid program and to require the residents receiving Medicaid to pay the same rate as residents not receiving Medicaid. Id. at 357-58. We concluded that the nursing home had not “refuse[d] to rent or imposed] different terms of tenancy” on the Medicaid recipients because the record showed that, by refusing to accept the lower Medicaid payment, the nursing home merely “subjected the [Medicaid] recipients to the same terms of tenancy offered to any other individual.” Id. at 357-58 (first and second alterations in original) (quotation marks omitted).
[¶ 16] Here, as in Catir, the undisputed facts demonstrate that Coach Lantern did not “refuse to rent [to] or impose different terms of tenancy” on Dussault. Rather, Coach Lantern was willing to, and in fact did, offer Dussault the apartment, and was willing to rent to her after learning of her status so long as it could do so without including the tenancy addendum. In essence, Coach Lantern offered to rent the apartment to Dussault on “the same terms of tenancy offered to any other individual.” Id. at 358. A landlord does not violate the MHRA by offering apartments to recipients of public assistance on the same terms as it offers *60 apartments to other potential tenants. See id.
[¶ 17] Even if we were convinced that Coach Lantern’s policy of declining to include the tenancy addendum in Dussault’s lease constituted a refusal to rent or imposition of different terms of tenancy within the meaning of section 4582, the undisputed facts show that Coach Lantern’s refusal to include the addendum was not “primarily because of [Dussault’s] status as recipient,” but rather because Coach Lantern did not wish to bind itself to the terms of the tenancy addendum. The term “status,” although not defined in the MHRA, is commonly defined as “[a] person’s legal condition, whether personal or proprietary; the sum total of a person’s legal rights, duties, liabilities, and other legal relations, or any particular group of them separately considered.” Black’s Law Dictionary 1542 (9th ed.2009). To the extent that there is any ambiguity in the meaning of “status,” the legislative history of the MHRA makes clear that the statute was meant to proscribe refusals to rent “made not with reference to the tenant’s personal responsibility and integrity ... but only on the general misapprehension that a family on public assistance is automatically an undesirable tenant.” L.D. 327, Statement of Fact (107th Legis.1975).
[¶ 18] We recognize the MHRA’s purpose to protect public assistance recipients’ rights to secure decent housing. We will not, however, read into the MHRA a mandate that landlords accept terms of tenancy that are otherwise required only if the landlord chooses to participate in a voluntary federal program. See 24 C.F.R. § 982.302(b) (noting that the voucher program is voluntary); see also Edwards v. Hopkins Plaza Ltd. P’ship, 783 N.W.2d 171, 176-77 (Minn.Ct.App.2010) (concluding that the voucher program is voluntary pursuant to state and federal law).
[¶ 19] We are limited by the language that the Legislature has enacted, and may not substitute our policy judgment for that of the Legislature. See Edwards, 783 N.W.2d at 179 (“[T]he issue of ensuring affordable housing availability is an issue for the ... Legislature or the United States Congress, which have the power to establish policy and enact laws in this area.”). The Legislature has not required landlords to accept Section 8 vouchers. Although the Legislature has considered a bill that would have effectively required landlords to participate in the voucher program, it has not, to date, made this voluntary program mandatory in Maine. See L.D. 685, § 2 (123rd Leg-is.2007) (proposing an amendment to the MHRA forbidding discrimination against recipients of public assistance “because of any requirement of such a public assistance program”); Comm. Amend. A to L.D. 685, No. S-162 (123rd Legis.2007) (removing the language regarding discrimination based on the requirements of public assistance programs from the bill).
C. Summary Judgment
[¶ 20] In deciding the parties’ cross-motions for summary judgment, the Superior Court ruled in favor of Coach Lantern on each of three different theories of discrimination: direct evidence, disparate treatment, and disparate impact. We address each theory in light of the interpretation of the MHRA that we have now articulated.
1. Direct Evidence
[¶ 21] Courts have historically addressed claims of direct evidence of discrimination through a “mixed-motive” analysis. See Patten v. Wal-Mart Stores E., Inc., 300 F.3d 21, 25 (1st Cir.2002). Pursuant to that analysis, a plaintiff must *61 first offer evidence that her status as a public assistance recipient was a “motivating factor” in the landlord’s refusal to rent to her. See id. (emphasis omitted). The defendant landlord then bears the burden of producing evidence that it would have refused to rent to the potential tenant even if she were not a recipient of public assistance. See id. Because the undisputed facts demonstrate that, in declining to include the tenancy addendum in its lease, Coach Lantern did not “refuse to rent or impose different terms of tenancy” on Dussault based primarily upon her status as a recipient of public assistance, Dus-sault has failed to present a prima facie ease of discrimination on a direct evidence theory.[5]
2. Disparate Treatment
[¶ 22] When a plaintiff makes a disparate treatment claim at the summary judgment stage, a three-step, burden-shifting test applies. See Daniels v. Narraguagus Bay Health Care Facility, 2012 ME 80, ¶ 14, 45 A.3d 722. First, the plaintiff must establish a prima facie case of discrimination. See id. Second, if the plaintiff has met her burden in the first step, the landlord must present evidence of a legitimate, non-discriminatory reason for the adverse action. See id. ¶ 15. Third, if the landlord meets its burden in the second step, the plaintiff must present evidence that the landlord’s proffered reason is pretextual or untrue. See id. This analysis addresses the parties’ burdens of production, not persuasion. See St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 521, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
[¶ 23] Here again, Dussault has failed to establish a prima facie case, because the undisputed facts show that Coach Lantern did not “refuse to rent or impose different terms of tenancy” on Dussault based primarily upon her status as a recipient of public assistance. See Lindsay v. Yates, 578 F.3d 407, 415 (6th Cir.2009) (requiring the plaintiff in a housing discrimination case to provide prima facie evidence that he or she applied for and was denied a housing accommodation); McDonald v. Coldwell Banker, 543 F.3d 498, 503, 505 (9th Cir.2008) (same); Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir.2003) (same); see also Cookson v. Brewer Sch. Dep’t, 2009 ME 57, ¶ 14, 974 A.2d 276 (discussing the requirement of a prima facie showing of discrimination in the employment context).
3. Disparate Impact
[¶ 24] We evaluate claims of disparate impact in the employment context using a similar three-step, burden-shifting analysis. See Me. Human Rights Comm’n v. City of Auburn, 408 A.2d 1253, 1264-65, 1268 (Me.1979). First, the plaintiff must establish a prima facie case of disparate impact by identifying a facially neutral practice that affects one group more harshly than another. Id. at 1264. Second, if the plaintiff meets her burden in the first step, the defendant must present prima facie evidence that its practice is justified by a business necessity. Id. at 1265. Finally, if the defendant meets its burden in the second step, the plaintiff must present prima facie evidence that the defendant’s proffered justification is pre-textual or that other practices would have a less discriminatory impact. Id. at 1268.
*62 [¶ 25] Nothing in the language of the MHRA suggests, however, that it imposes disparate impact liability on a landlord for discrimination against an individual because of the individual’s status as a recipient of public assistance. See Smith v. City of Jackson, 544 U.S. 228, 233-40, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) (concluding that the Age Discrimination in Employment Act created disparate impact liability because its text “focuses on the effects of the action on the employee rather than the motivation for the action of the employer”).[6] As we have noted, the only discrimination that the MHRA prohibits with respect to public assistance recipients is “refus[al] to rent or impos[ition of] different terms of tenancy” based primarily on a person’s status as a recipient. 5 M.R.S. § 4582.
[¶ 26] Dussault argues that section 4583 incorporates disparate impact liability into the housing discrimination provisions of the MHRA, and that the legislative history of the statute supports this contention. This argument, however, finds no support in the language of section 4583. See Eagle Rental, 2013 ME 48, ¶ 11, 65 A.3d 1278 (noting that we do not consider legislative history if a statute is unambiguous). Nothing in the language of section 4583 broadens the MHRA’s protections of recipients of public assistance; rather, section 4583 limits those protections by providing landlords with a defense of business necessity for conduct that might otherwise violate section 4582. See Smith, 544 U.S. at 251-52, 125 S.Ct. 1536 (O’Connor, J., concurring) (opining that, contrary to the plurality opinion, a provision in the Age Discrimination in Employment Act permitting discrimination based on “reasonable factors other than age” did not create disparate impact liability, but rather created a “safe harbor” for defendants (emphasis omitted) (quotation marks omitted)). We therefore conclude, as a matter of law, that the MHRA, as currently established by the Maine Legislature, does not create disparate impact liability in the context of claims of housing discrimination based on a landlord’s decision not to participate in the voluntary voucher program established by Section 8.
[¶ 27] In reaching the opposite conclusion, the dissent relies heavily on the federal courts’ interpretation of the Fair Housing Act (FHA), 42 U.S.C.A. §§ 3601-3631 (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13). Unlike the MHRA, however, the FHA does not prohibit housing discrimination on the basis of an individual’s status as a recipient of public assistance. Id. § 3604(a)-(e) (prohibiting housing discrimination “because of race, color, religion, sex, familial status, or national origin”). Moreover, the FHA more broadly defines the discrimination it prohibits, making it a violation of the Act “[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person ” because of their protected status. Id. § 3604(a) (emphasis added). This language stands in contrast to the MHRA’s relatively narrow prohibition of “refus[al] to rent or imposition of] different terms of tenancy” based primarily on a person’s status as a recipient of public assistance. 5 M.R.S. § 4582; see also Smith, 544 U.S. at 233-40, 125 S.Ct. 1536. Although we look to federal law for guidance in interpreting the MHRA, we *63 “must not abdicate [our] function of conclusively resolving matters of purely state law.” Fuhrmann, 2012 ME 135, ¶ 27, 58 A.3d 1083 (alteration in original) (quotation marks omitted). This is particularly true where Congress has taken pains to identify the voucher program as entirely voluntary.
[¶ 28] The dissent’s interpretation of section 4583 would effectively compel Maine’s landlords to participate in a voluntary federal housing subsidy program or risk having to litigate whether their decision not to participate is based on a “business necessity.” For many of Maine’s small or mid-sized landlords, the expense and uncertainty of litigation simply may not be an option. Had the Legislature intended to impose this requirement on landlords, it would have done so clearly, particularly in light of the fact that it would have effectively overruled our holding in Catir. See 543 A.2d at 357-58 (holding that a nursing home did not violate the MHRA by offering housing to Medicaid recipients on “the same terms of tenancy offered to any other individual”). “In the absence of clear and explicit statutory language showing that the legislature intended a statute to modify case law, we will not interpret a statute to effect such a modification.” Caron v. Me. Sch. Admin. Dist. No. 27, 594 A.2d 560, 563 (Me.1991) (emphasis added).
[¶29] The dissent suggests that our interpretation of the MHRA allows landlords to avoid liability by simply alleging business necessity rather than proving it. Dissenting Opinion ¶58. We do not so hold. Rather, because we conclude that sections 4582 and 4583 do not create disparate impact liability in the context of claims of housing discrimination based on a landlord’s decision not to accept the tenancy addendum in order to participate in the voucher program, and because Dus-sault has not otherwise made out a prima facie case of housing discrimination, we do not reach the issue of business necessity.
D. Conclusion
[¶ 30] Because the undisputed facts show that Coach Lantern did not discriminate against Dussault in violation of the MHRA, we affirm the summary judgment in favor of Coach Lantern and the denial of Dussault’s cross-motion for summary judgment.
The entry is:
Judgment affirmed.

. Title 5 M.R.S. § 4582 has been repealed and replaced by P.L. 2011, ch. 613, §§ 11-12 (effective Sept. 1, 2012) (codified at 5 M.R.S. § 4581-A (2013)), but the change does not affect this appeal. The relevant language of the new section 4581-A is substantially identical to that of prior section 4582.

. The federal program originated with section 8 of the United States Housing Act of 1937, P.L. 75-412, 50 Stat. 888, as amended by the Housing and Community Development Act of 1974, P.L. 93-383, § 201(a), 88 Stat. 633, 662-666, and is now codified at 42 U.S.C.A. § 1437f (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13), with associated regulations at 24 C.F.R. §§ 982.1-.643 (2013). It is administered by the United States Department of Housing and Urban Development (HUD) in conjunction with state and local housing agencies. See 24 C.F.R. §§ 982.1, 982.3.

. Dussault withdrew her request for injunc-tive relief in her motion for summary judgment, as she does not plan to seek housing at Coach Lantern properties in the future.

. Title 5 M.R.S. § 4581 has since been amended by P.L. 2011, ch. 613, § 10 (effective Sept. 1, 2012) (codified at 5 M.R.S. § 4581 (2013)), but the change does not affect this appeal.

. Given this conclusion, we need not address the continuing vitality of the "mixed-motive” analysis in light of Gross v. FBL Financial Services, Inc., 557 U.S. 167, 173-80, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) (interpreting the Age Discrimination in Employment Act’s bar on discrimination "because of” age as requiring a showing of but-for causation, rather than a showing that age was simply a motivating factor).

. Although none of the parties or amici have directly argued that the MHRA does not impose disparate impact liability on a landlord for discrimination against an individual because of the individual's status as a recipient of public assistance, a necessary first step in our analysis is to determine whether such liability exists.