STATE OF MAINE
KENNEBEC, ss

SUPERIOR COURT
CV-15-135

MAINE HUMAN RIGHTS COMMISSION,
SHIRLEY KELDERHOUSE, and SHAUNN
PATTON,

      Plaintiffs,

v.

**FINDINGS AND ORDER FOR
ENTRY OF JUDGMENT**

MEGUNTICOOK MANAGEMENT AND
REALTY CORPORATION and
JEFFREY WEYMOUTH,

      Defendants

## Background

This matter came before the Court for trial without a jury on February
21-24, 2017. The Maine Human Rights Commission (MHRC) is represented by Attorney
Barbara Archer-Hirsch. Attorney Patricia Ender represents Ms. Kelderhouse and Mr.
Patton. Attorney Rebecca Webber represents all Defendants. An Amended Complaint
was filed with the Kennebec County Superior Court on September 22, 2015 alleging
three counts: Count 1 against Defendant Megunticook Management and Jeffrey
Weymouth for violation of the Maine Human Rights Act, 5 M.R.S.§4581-A(B)(1)
prohibiting discrimination in housing accommodation based on race; Count II against

1

Rosemary Weymouth for violation of that same statutory provision; and Count III against all Defendants alleging violation of the Federal Fair Housing Act, 42 U.S.C. §3604(A). On January 4, 2016 this Court denied Defendant Rosemary Weymouth's Motion to Dismiss all claims brought against her. On January 26, 2017 the Court granted Ms. Weymouth's Motion for Summary Judgment for all claims brought against her, but denied the motion as to other Defendants. The case then proceeded to trial on all three Counts against Defendants Megunticook Management and Jeffrey Weymouth.

The Court has considered the evidence and exhibits, as well as the parties' written closing arguments, the last of which were received on March 28, 2017, and issues the following findings and Order for Entry of Judgment.

### Standard of Review

In reviewing claims for discrimination in housing accommodation brought pursuant to the Maine Human Rights Act and the Federal Fair Housing Act post-trial, the Court applies the *McDonnell Douglas* burden-shifting test. In *Dussault v. RRE Coach Lantern Holdings, LLC*, the Law Court applied the McDonnell Douglas test to a similar claim for disparate treatment:

> When a plaintiff makes a disparate treatment claim …, a three-step, burden-shifting test applies. *See Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, P 14, 45 A.3d 722. First, the plaintiff must establish a prima facie case of discrimination. *See id.* Second, if the plaintiff has met her burden in the first step, the landlord must present evidence of a legitimate, non-discriminatory reason for the adverse action. *See id.* ¶ 15. Third, if the landlord meets its burden in the second step, the plaintiff must present evidence that the landlord's proffered reason is pretextual or untrue. *See id.* This analysis addresses the parties' burdens of production, not persuasion. [***20] *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08, 521, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

*Dussault v. RRE Coach Lantern Holdings, LLC*, 2014 ME 8, ¶ 22, 86 A.3d 52.

2

In setting out a prima facie case for discrimination in housing accommodation pursuant to the Maine Human Rights Act, the plaintiff must show that the defendant who is a person or agent of a person having the right to sell or rent or manage housing, unlawfully discriminated against plaintiff by "refus[ing] to show or refus[ing] to sell, rent lease, let or otherwise deny[ing] to or withhold[ing] from any person the housing accommodation because of race or color, sex, sexual orientation, physical or mental disability, religion, ancestry, national origin or familial status". 5 M.R.S. § 4581-A. According to the federal Fair Housing Act, " it shall be unlawful …[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604. The Federal Courts have interpreted the Fair Housing Act broadly, finding that discrimination in the application process and the denial of the "opportunity to inspect, or even inquire about" rental housing for discriminatory reasons constitute "discriminatory housing practice[s]". *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 250 (9th Cir. Cal. 1997).

The Law Court has held that in order to show that the refusal to show or rent or otherwise deny housing to plaintiff must be "a substantial, even though perhaps not the only, factor motivating" the defendant. *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 25, 28 A.3d 610; citing *Wells v. Franklin Broadcasting Corp.*, 403 A.2d 771, 773 (Me. 1979); *Maine Human Rights Comm'n v. City of Auburn*, 408 A.2d 1253, 1268 (Me. 1979). In the analogous employment discrimination case, *Wells v. Franklin Broadcasting Corp.*, the Law Court held that "even if more than one factor affects the decision to dismiss an employee, the employee may recover if one factor is his age and in fact it

3

made a difference in determining whether he was to be retained or discharged. If an employee would not have been dismissed but for his age, the existence of other reasonable grounds for his discharge does not relieve the employer from liability under the applicable statutory provisions." *Wells,* 403 A.2d at 773. Similarly, in a housing discrimination such as the one before the court, the plaintiff must show that race was a contributing factor to the defendant's decision not to rent to the plaintiff. See *Marano v. Department of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) ("The words "a contributing factor" . . . mean *any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision."*).The plaintiff is not required to prove that race was the only factor in defendant's refusal.

The Federal Courts have adapted the *McDonnell Douglas* proof standard to claims brought pursuant to the Fair Housing Act to require a plaintiff to show that "she is a member of a protected class who applied for and was qualified to rent housing, that she was rejected, and that the housing opportunity remained available." *Gilligan,*108 F.3d at 249. The *McDonnell Douglas* standard governs the burdens of proof, but "it does not dictate the required elements of a complaint." *Id.* To that end, where there is no evidence that a plaintiffs other qualifications for housing were considered by defendant, the court does not require plaintiff to affirmatively prove that plaintiff is otherwise qualified for housing. See *Id; White v. HUD*, 475 F.3d 898, 906 (7th Cir. 2007); *Bezi v. Camacho*, 2014 U.S. Dist. LEXIS 74047, *28 (C.D. Cal. Mar. 19, 2014) ("even without alleging or proving financial qualification, a violation of the Fair Housing Act may still have occurred").

Conversely, pursuant to the Maine Human Rights Act, the court need not make a finding concerning plaintiff's qualification for housing. The court is required to make a finding as to whether a plaintiff is otherwise qualified for a job where the plaintiff complains of employment discrimination (5 M.R.S. § 4572(2)), and the court is required to make a finding that the plaintiff is otherwise qualified for an educational opportunity where the plaintiff complains of educational discrimination (5 M.R.S. § 4602(2)(A)). However, the Maine statute does not require the court to make a finding that the plaintiff is otherwise qualified for the housing where the plaintiff complains of housing discrimination. *See* 5 M.R.S. § 4581-A. Plaintiffs' burden is to prove that race was a contributing factor in Defendants' refusal to rent to Plaintiffs.

### Findings and Conclusions

Plaintiffs Shirley Kelderhouse and Shaun Patton are the biological parents of two minor daughters, "J" and "M". Ms. Kelderhouse is white, Mr. Patton is African-American, and their daughters are therefore biracial. Both girls have African-American features. M is severely disabled, having been born prematurely to Ms. Kelderhouse at 26 weeks. She weighed 1.5 pounds at birth and is confined to a wheelchair which is essentially a modified stroller. She cannot speak but seems able to communicate certain needs, and she is fed through a tube. She has severe cerebral palsy, a significant seizure disorder, and scoliosis. She has recently been diagnosed as being terminally ill due to multiple maladies and their effects on her lungs and heart. Ms. Kelderhouse and Mr. Patton have a relationship that is limited to co-parenting.

On August 30, 2014 Ms. Kelderhouse contacted Megunticook by phone in response to an advertisement for rental housing at Townhouse Estates in Camden, Maine.

She left a voice mail saying she was interested in renting the property and that it needed to be handicap-accessible because of M's disabilities. Jeffrey Weymouth, who is part owner (as well as Secretary and Treasurer) of Megunticook, returned the call. According to both Ms. Kelderhouse and Mr. Weymouth, the conversation was cordial and involved the sharing by both of them of personal information. Ms. Kelderhouse explained how disabled M was as a result of her prematurity. Mr. Weymouth in turned disclosed that he and his wife, Defendant Rosemary Weymouth, had lost a young child due to medical complications, and he understood how difficult it was to care for a severely disabled child. Ms. Kelderhouse said that they both got "emotional" on the phone, and that Mr. Weymouth said he would get the ramp built, and that he would do anything and everything he could to make her life better. Ms. Kelderhouse talked to him about J as well, and that they wanted to move to Camden because she was interested in being in a good school system that had strong performing arts programs.

According to Ms. Kelderhouse, the call ended with Mr. Weymouth asking her if she wanted to go forward with the process. When she said yes, she was told that she would be hearing from a woman named Peggy. She testified that she felt excited, and was sure "that he was going to help us" as her family needed to be out of their home in Dover-Foxcroft by October 1, 2014.

The day after this phone call, Rosemary Weymouth collapsed while working for Megunticook. She was treated medically, but returned to work quickly. Her husband and son testified that she was an extremely hard worker who did not know how to slow down. They both stated that as a result of this medical event, she curtailed some of her duties at Megunticook which previously had included being the person primarily responsible for

dealing with the entire rental application process for tenants of Megunticook, including those like Ms. Kelderhouse who were applying for subsidized housing. The evidence is clear that Mrs. Weymouth was not aware of any of the events that transpired between her husband and Ms. Kelderhouse until she received a copy of the Plaintiffs' MHRC complaint, and there is no evidence she was involved in any of the decisions made by her husband about the Plaintiffs' application.

The day after the fall, Ms. Kelderhouse requested and received a written application to rent housing at Megunticook. She filled it out and stated that the occupants would be Mr. Patton (described as a "live-in" aid for M) along with Ms. Kelderhouse, and the Plaintiffs' two daughters. Mr. Patton testified that after learning that M was terminal, he and Ms. Kelderhouse agreed that he should come back from Arizona, where he had been attending to the death of his father. The plan was that he would move in with his daughters and their mother so that he could help care for M. He testified that as M grew, it became much more difficult for Ms. Kelderhouse to care for her, which included lifting her for bathing and toileting. He testified that it gotten to the point that Ms. Keldherhouse developed a hernia as a result of these activities.

On September 15, 2014 Ms. Kelderhouse talked to Megunticook's office assistant, Peggy Wilson, to confirm that they had received the application which was admitted at trial as Plaintiff's Exh. 15. A walk-through was scheduled for September 19, 2014 and Megunticook conducted a credit check on Ms. Kelderhouse. Mrs. Weymouth testified that no walk-throughs are scheduled by Megunticook without the applicant having an acceptable credit score. Ms. Kelderhouse testified that she believed she would

7

be "all set" to be offered the apartment as she had a "Section 8 voucher" and that they would not have scheduled the walk-through unless they had approved her credit score.

Ms. Kelderhouse went to Megunticook on September 19 along with her daughters. Ms. Kelderhouse testified that J came in the door first, followed by Ms. Kelderhouse who was pushing M's stroller. She remembers Mr. Weymouth getting up from his chair to look at M in her wheelchair. J testified that Mr. Weymouth gave a look that "was kind of weird" when he first saw M in her stroller. J initially attributed the look to the fact that her sister was "not normal". Ms. Kelderhouse also noted Mr. Weymouth's looking at M but suggested that she and her family were used to people looking at them in this fashion. J testified further that when she saw the apartment it was not as nice as she had hoped but "it was good enough given our time frame" as she and her family had to be out of their current home. She and her mother spoke with one another and then told Mr. Weymouth they wanted to live there. Mr. Weymouth asked J if it was her father that was going to be living with them and she told him it was. She testified that at that point Mr. Weymouth indicated there would be a delay in building the ramp. She stated that she felt confused by Mr. Weymouth's asking her about her father living with them and thought that was a question he should have asked her mother. She remembers him getting "more closed off" after learning that her father would be living with them, and felt that he cared "a little less" than he had seemed before and wanted "to get us out." J testified that she stayed with M while her mother went to sign papers with Mr. Weymouth and remembers her mother indicating that she was hopeful that "it would happen" that they would get the apartment.

8

J testified that while waiting to hear back from Megunticook her mother became more and more stressed out, as did her father. She stated that after awhile she came to the conclusion that Megunticook stopped processing their application because of "who we are," and their skin color. She recalled the look he had given them and figured that it was not about M's disability as her mother had told him before the walk-through that M was severely disabled. She says the "only other explanation" she could arrive at was that it was because of race, and that it could not have been about "my sister" or "the dog" that she had mentioned they had obtained for M. She stated that M looks very ethnic, and that she has had people judge her over her race before, and "I have seen the look before." She conceded that she did not come to the conclusion about Mr. Weymouth's motivations until "things fell apart" when she was "trying to make sense of it." She characterized the look as a "very judgmental one."

Ms. Kelderhouse similarly testified that she noted a change in Mr. Weymouth's demeanor once J told him that it was her father that was going to be moving in with her, her mom and her sister M. While she did not testify at trial, as J did, that he gave the children a "weird look" when he first saw M in her stroller, Ms. Kelderhouse testified that she recalled him standing up from a seated position when they entered, as if to get a good look at M. She insisted, however, that his behavior "just shifted" as soon as J told him about her father moving in. She said he had initially seemed so nice and positive about them renting, but as soon as J mentioned her father moving in "he completely changed."

He did, however, return with them to the Megunticook office to begin the paperwork. The parties do not agree on what paperwork was completed, or whether it

was adequately completed. Ms. Kelderhouse testified that she was left with the impression that she had done everything she had to that day as far as the paperwork was concerned and that all that was left was for him to fill in certain information as the landlord. Despite this, she was concerned that he might be just "going through the motions" as his handshake did not seem genuine, and she sensed a new reluctance in his demeanor. Nevertheless, she testified that she decided to take him at his word, and that she told Mr. Patton and a friend that it looked like they would be getting the apartment. She explained that despite his change in demeanor, she "tried to remain positive" and understood that she had to cooperate in the process and "do her part." When Ms. Kelderhouse told Mr. Patton that it looked likely they would get the apartment, he began transferring utilities from the home they were leaving to Megunticook, and she began waiting to hear back from the Defendants about final approval. She testified that she understood that what remained to be done since she already had "Section 8 approval" was for an inspection to be done, the ramp had to be built, and she would need to sign a lease.

Over the next couple of weeks, Ms. Kelderhouse attempted to communicate with Mr. Weymouth about the status of the application. Defendants acknowledge that she called several times four days later. Their position is that after receiving these calls, Mr. Weymouth went to Ms. Wilson[1] who he says had not completed the paperwork. On September 30, Ms. Kelderhouse called them twice, and Mr. Weymouth called her back but did not get through. Ms. Wilson also sent her an email saying that Mr. Weymouth had been so busy that he could not complete the paperwork and could not help her "at that time." She called him on October 1, and he returned the call. She testified that he told her

---

[1] Ms. Wilson was not called by either party. Counsel for the Plaintiffs subpoenaed her but she sent them a note from a doctor saying she could not testify. It is undisputed by the parties that she left her employment at Megunticook under less than favorable terms.

that he was sorry but that he could not help her. Ms. Kelderhouse, feeling desperate about her need for housing, told him that if he needed more time that she might be able to make that work. However, Mr. Weymouth told her that he just could not help her, and "to think of the glass as half full." He did not recall making that statement.

The parties agree that Megunticook did not rent the apartment to any other person, and that it remained available for rent for months after the Plaintiffs were turned away.

There is no evidence in the record that Defendants ever told Ms. Kelderhouse that the reason the paperwork was not completed was that Rosemary Weymouth, who usually does such paperwork, had health problems and was unavailable. There is evidence in the record that after Ms. Weymouth collapsed on Labor Day she returned to work essentially full time. Defendants take the position that Mr. Weymouth (and his son) stepped in to do certain tasks Mrs. Weymouth usually did while she resumed full time duties. They also argue that Mr. Weymouth does not have the skills or training to complete the paperwork, but again there is no evidence that they ever told Ms. Kelderhouse that was the reason the process ended. They also argue that Ms. Wilson should have learned how to do this paperwork, but that she had refused to do so. They blame Ms. Wilson, in large part, for their failure to respond to Ms. Kelderhouse's efforts to check on the status of the application

Mr. Weymouth testified that he is part owner of Megunticook. He stated he does remember telling Ms. Kelderhouse in their phone call about the loss of a child, and that she shared with him that M was severely disabled. He agreed he told her he wanted to help them, that they had a connection, and that he actually "got stuffy" during the call. He told her that "if you need a ramp we can make that work." He recalls the walk through on

September 19, but does not remember giving a look that was weird. He said he simply stood up when they entered as he was raised to do, but "if they think it was weird, it was weird." He also says he does not remember asking J about her father moving in, but acknowledged that was what she and Ms. Kelderhouse remembered.

He offered various explanations for why the application process ended: Mrs. Weymouth could not do the paperwork, Ms. Wilson could not or refused to do the paperwork, and that he had run out of time. He acknowledged that he had never asked his wife for help in the process, even though the evidence suggests that she was back to work well before the October 1 phone call. He conceded that there was a credit report done on Ms. Kelderhouse before the walk through, and that usually Ms. Wilson as the Office Manager would ordinarily not schedule a walk through if the credit score was bad. He denies noticing the credit score in the file. He also testified that the more Ms. Kelderhouse called the more annoyed he became at "being pushed." However, there is no evidence in the record that he ever spoke with her directly between the time of the walk-through and the time he told her on October 1 that he could not help her, and he did not point to any particular conversation or writing to support his description of her behavior. He adamantly denied that race was a factor in any decision he made on behalf or Megunticook.

Mrs. Weymouth testified that she knew nothing about Ms. Kelderhouse's application until the MHRC notice, and that she had nothing to do with her husband's actions in relation to it. Like Mr. Weymouth, she blamed Ms. Wilson for not completing the Section 8 paperwork in a prompt fashion, and not bringing it to her attention. She testified about the fall, and how hurtful the allegations against her family and business

12

had been. She said she is the person who handles all aspects of tenant paperwork, and that it was unrealistic for anyone to think the application process for this apartment, which involved Rural Housing and Section 8 requirements, could have been completed in 10 days, and that there was "a lot left to do" on the forms. However, she also testified that she wished she had known about it and would have been willing to work "til midnight" to get the paperwork done. She also faults Ms. Wilson for not doing "due diligence." She said Ms. Wilson's work performance had been steadily slipping over the last few months she worked at Megunticook, and attributed that to Ms. Wilson's grandchildren moving in with her. Mrs. Weymouth also claims that had she handled the application, she would likely have denied the application based on Ms. Kelderhouse's credit, together with the fact that M had a dog. J had testified they were more than willing to find another home for the dog if that had ever been raised as an issue, but no one raised the issue. Mrs. Weymouth also stated that her husband should never have told Ms. Kelderhouse that he could not give her more time and indicated that if Ms. Kelderhouse had been willing to give us more time "we would have worked with her." Nevertheless, the Defendants' position is that an extended timeline would not have affected the outcome, as Ms. Kelderhouse was not "otherwise qualified" to be a tenant for a number of reasons including the dog, the credit score, uncertainty that a ramp and inspection would have been approved, and whether Mr. Patton would have qualified as a live-in aid under government standards.

Defendants also argue strenuously that they are not racist, and point to close familial and professional relationships with people of color. A number of witnesses testified credibly that they had never experienced or seen any evidence of racial animus

on the part of either Mr. or Mrs. Weymouth, and the Court finds there is no credible evidence on the record of direct discrimination.[2]

Defendants make numerous arguments. First, they claim that Mr. Weymouth did not even know that Mr. Patton was African-American based simply on the fact that J and M are bi-racial. The Court finds this argument to be unpersuasive. Ms. Kelderhouse testified credibly that in the initial phone call she told Mr. Weymouth that she had given birth to the girls, who clearly have African-American features. Any reasonable person would conclude from Ms. Kelderhouse's statement about having given birth to the girls, together with her appearance and theirs, that their father is African American. Mr. Weymouth actually did not testify about his thought process in this regard but the possibility of adoption or foster care was repeatedly posed by defense counsel as a hypothetical about the ethnic origin J and M's father. Rather, Mr. Weymouth essentially said the girls' skin color did not register with him, that he had no memory even of asking J about her father, and further that he would not ask a child a question like that. The Court finds J to be credible that the conversation took place and that the question was asked by Mr. Weymouth. The Court also finds her credible as to her observations about Mr. Weymouth's reaction upon learning that J's father, Mr. Patton, would be living in the apartment with them. The defense expended much effort in drawing out words and phrases Ms. Kelderhouse had used at different times to describe Mr. Weymouth's demeanor. Ms. Kelderhouse was not the most articulate witness and she seemed confused at times about when she gave statements containing descriptions of his demeanor.

---

[2] Plaintiffs on page 4 of their Reply Brief concede that there is no direct evidence of discrimination in this case.

14

However, J was the person involved in this conversation, not Ms. Kelderhouse, and the Court found J's testimony overall to be credible about this interaction.

The Defendants also question how it could be that Ms. Kelderhouse could on the one hand believe that Mr. Weymouth's demeanor at the walk-through had changed, while at the same time expressing hope to her family and friend that they would get the apartment. This apparent contradiction does not, however, cause the Court to question Ms. Kelderhouse's testimony for that reason. It is not unusual for a person to hope for the best, even in the face of worry that something negative or painful might be about to unfold. The Court is also not troubled by Ms. Kelderhouse's and J's admission that their initial reaction to Mr. Weymouth's look and changed demeanor might have something to do with M's striking physical appearance and disabilities. The Court would think it obvious that people commonly react to M's appearance, and that her family has become accustomed to these reactions. It was only after the rental application hit a dead-end, with no credible explanation being given to them for the rejection, that they connected Mr. Patton's presence in the household with what went wrong with their application. The Court cannot find that the delay in coming to the conclusion is cause to question the conclusion itself. On the contrary, it would be concerning to the Court if J and Ms. Kelderhouse immediately jumped to the conclusion that race was a motivating factor in how Megunticook treated their application.

The Court concludes based on the indirect, circumstantial evidence[3] in the record that Plaintiffs have established a prima facie case of discrimination. That evidence is based primarily on the credible testimony of J, and to a lesser extent that of Ms.

---

[3] The Court agrees with the Plaintiff that given the lack of direct evidence of racial discrimination, the correct standard is that set out in *Dussault v. RRE Coach Lantern Holding, LLC,* 2014 ME 8. *Dussault* sets out the three-step burden-shifting analysis that the Court will follow in this case.

Kelderhouse, as to what transpired at the walk-through. Mr. Weymouth knew that Ms. Kelderhouse's children were her biological children, and that she is white. He learned that their father would be living with them, and the Court does not believe that it did not dawn on Mr. Weymouth that their father must be African-American. In addition, as the Court stated previously, housing was denied Ms. Kelderhouse and Ms. Patton by Megunticook within the meaning of 5 MRS §§4581-A(1)(B) and 42 U.S.C §3604(a). They are members of a protected class; and they were qualified for a housing *opportunity,* which in this case means they had a right to have their application reviewed; and their application was denied while the housing opportunity remained available to others. *Lugo-Berrios v. Citibank, N.A. 2013 U.S. Dist. LEXIS 45996,* (citing *Lindsay v. Yates,* 578 F.3d 407 (6th Cir. 2009). [4] As Plaintiffs point out, the evidence is unrefuted that Mr. Weymouth and Peggy led Ms. Kelderhouse to believe that they were processing her application when they were not. By allowing the walk through to happen at all, and then proceeding to go through the checklist at the office, Defendants are effectively conceding that they believed she was qualified as of October 1. In addition, they never told her that she was not "qualified" for any reason up to that date -- they just let clock run and the deadline expire on the notice to quit she had received from her landlord. And as previously noted, no one at Megunticook ever told Ms. Kelderhouse that the delay had anything to do with Mrs. Weymouth's health issues, even after Ms. Kelderhouse, as Mr. Weymouth concedes, told them that she could wait longer for the processing if that would help her get the apartment. If Mrs. Weymouth's health was the reason for the delay, that would have been a good time for Mr. Weymouth to provide that explanation.

---

[4] MHRC regulations specifically address situations akin to this. 348C.M.R. Ch. 8 § 8.04(D)(4)(c) states that included among prohibited rental practice is "denying or delaying the processing of an application made by a…renter."

With respect to the second step of the analysis, whether the Defendants can articulate a legitimate, nondiscriminatory reason for their action, the Court finds that Mrs. Weymouth's collapse likely resulted in Megunticook not running as well as it does when she is fully functioning, and that some delay in processing Ms. Kelderhouse's application occurred as a result. Clearly, both Mr. and Mrs. Weymouth are very hard-working people, who along with their son run a successful housing business. Mrs. Weymouth clearly is the person who understands the complexities and requirements of subsidized housing. They are well respected in their community and obviously take a lot of pride in what they have accomplished. However, the Court does not find that the collapse and resulting delays adequately explain the decision Megunticook made to discontinue the application process. First, the evidence suggests that Mrs. Weymouth was back to work by mid September. Second, Mr. Weymouth and Ms. Wilson, who were both agents of Megunticook, held themselves out to Ms. Kelderhouse as capable of processing the application. At no time did either Ms. Wilson or Mr. Weymouth explain the difficulties resulting from Mrs. Weymouth's temporary absence from the business to her. Given the information Mr. Weymouth and Ms. Kelderhouse had shared about personal aspects of their lives, specifically the terrible difficulties associated with caring for, and in Mr. Weymouth's case, losing, a severely disabled child, it is difficult to understand why no one from Megunticook simply explained to Ms. Kelderhouse that they needed more time because Mrs. Weymouth was not well. The Court finds that her temporary absence likely caused just a brief delay. This brief delay does not credibly explain Mr. Weymouth's announcement on October 1 that Megunticook could not "help" Ms. Kelderhouse, or his strange remark that she should "think of the glass as half full." These remarks were a

clear signal to her that Megunticook was not willing to process any application for Ms. Kelderhouse, and a message that she should not call them again.

The other justifications put forth by Megunticook, namely that her credit score was bad, that Ms. Kelderhouse's family had a dog, and that Ms. Wilson refused to do the paperwork are also not credible. As noted previously, no one brought up the credit score, the dog, or Mrs. Weymouth's health issues either at the walk through, or at the office, in email communication, or over the phone. All of these justifications were known to Megunticook before October 1, and the fact that they were not mentioned until much later, and only after a claim for discrimination was made, undercuts Megunticook's credibility on this issue.

The Court therefore concludes that the Defendants' proffered reasons for the delay were pretextual, and that race was a motivating factor in the Defendants decision to end Plaintiffs' application process.

Defendants also argue that Plaintiffs cannot prove their discrimination claims because Ms. Kelderhouse would not have been approved for the housing even if the application process was completed. They claim her credit score, the family dog, and the unresolved issue about whether or not Mr. Patton would qualify to live in the apartment as a caregiver for M, would have individually or in combination resulted in Plaintiffs being "unqualified" to rent the unit.

As noted above, the requirement that a Plaintiff be "qualified to rent" housing does not appear in the MHRA, and the Law Court has not been called upon to decide whether being "qualified" should be considered as an element of proof in an MHRA

action.[5] The Court has reviewed the federal cases cited by the parties, and finds the reasoning in *White v. HUD,* 475 F.3d, 898, 906 (7th. Circuit) to be sound. When Mr. Weymouth made the decision to terminate Plaintiffs' application process on October 1, 2014 there is no evidence in the record that he considered the dog, the credit score, or Mr. Patton's eligibility to live in the unit before deciding that Megunticook just "could not help" Ms. Kelderhouse. The Court has concluded that its focus should be on what was considered by the Defendants at the time the decision was made to make the unit unavailable to them, and what Defendants may have known about Plaintiff's "qualifications" at the time the decision was made. The credit report was in the Plaintiffs' file before the walk-through, and J testified that she mentioned the dog to Mr. Weymouth during the walk-through. However, there is no credible evidence in the record that Defendants were at all troubled by the dog, the credit score, or Mr. Patton's eligibility to be a "live in aid" under either Rural Housing or Section 8 requirements when the decision was made. The Court finds therefore that Plaintiffs were qualified to pursue the application at the time Megunticook otherwise made the unit unavailable to them.

## Damages

Both Plaintiffs seek actual and compensatory damages which they enumerate as humiliation, mental anguish, and emotional distress pursuant to 5 M.R.S. §4613(2)(B)

---

[5] As the parties have noted throughout this litigation, the Law Court often relies upon federal case law when interpreting the discrimination provisions of the MHRA. The Court therefore addresses the argument made by Defendants that Plaintiffs had to have been qualified to rent the unit. The Court, however, does not agree that this requirement allows the Court to speculate on what a hypothetical decision-maker might have considered. While Mrs. Weymouth testified that she does not believe they would have qualified for the reasons discussed here, the parties agree that she was not the decision maker, and she was dismissed by the Court as a named Defendant at the summary judgment stage in large part because she was not even aware of the application until months after the application process was terminated by Mr. Weymouth.

and 42 U.S.C. §3613(c)(1). Ms. Kelderhouse also alleges that she suffered physical ailments as a result of the discrimination, including hair loss, effects on her menstrual cycle, sleep disruption and depression.

While it is true that a Plaintiff need not provide expert testimony to prove certain kinds of damages, the Court agrees with the Defendants that Ms. Kelderhouse has failed to prove by a preponderance of evidence the claimed physical effects of hair loss, menstrual disruption, sleep disruptions, and depression. Those kinds of damages would require expert testimony which was not presented. In addition, Ms. Kelderhouse conceded that she had experienced the need for medication for depression prior to these events, and the Court finds that the Defendants have proven by a preponderance of evidence that the physical ailments claimed were not caused by the Defendants conduct. *Lovely v. Allstate Insurance,* 658 A.2d 1091 (Me. 1995).

However, Plaintiffs have proven by a preponderance of evidence what the parties refer to as "garden variety" emotional distress damages. Ms. Kelderhouse testified credibly that she felt humiliated and sad about losing this housing opportunity for her family. She was panicked about where they would live, and felt responsible for not being able to protect M, and provide the opportunity for J to live in a great school district. She was tearful, and felt too embarrassed to go out in public. She could not keep up with her daily responsibilities and she and Mr. Patton began arguing. Mr. Patton and to a lesser extent J corroborated this testimony. Mr. Patton also testified credibly that he blamed himself for the loss of housing, because he believed that if it was just Ms. Kelderhouse and the children applying, Megunticook would have accepted them. He also felt guilty as their father, and sad that his children had to endure what had happened. He said it is

20

difficult for him to express his feelings, that he had learned in his life and the military "to go with the punches" in life but that it was "really difficult" to accept that in 2014 "this kind of thing was still happening."

Both Ms. Kelderhouse and Mr. Patton conceded that they felt better relatively soon, and that things improved once they secured housing in Bangor in December, and that the evidence suggests that by the spring of 2015 things were much improved. The Court will therefore award emotional distress damages to each of them for this limited period in the amount of $15,000.[6]

In addition, the Court will assess a civil penalty against Defendants under the MHRA in the amount of $10,000. Plaintiffs are also allowed interest and costs, and an award of counsel fees.

The entry will be: Judgment is issued to Plaintiffs on claims against Defendants Jeffrey Weymouth and Megunticook Management and Realty Corporation under the

---

[6] Plaintiffs state in their brief that they are not seeking and are not entitled to "duplicate money awards" under both statutes. (Pl.'s brief, pg 20).

Maine Human Rights Act and the Fair Housing Act (Counts I and III). Damages are awarded in the amount of $15,000 to each Plaintiff for emotional distress damages. A civil penalty is assessed against the Defendants in the amount of $10,000. Plaintiffs shall have interests and costs, and may submit a request for counsel fees for consideration by the Superior Court.

_____
**DATE**

_____
**SUPERIOR COURT JUSTICE**